[Crim. No. 7242. In Bank. June 16, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. DAN CLIF-TON ROBINSON, Defendant and Appellant.

[Crim. No. 7279. In Bank. June 16, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES DRIVERS, Defendant and Appellant.

Al Matthews, Burton Marks and Frank Hemminger, under appointment by the Supreme Court, for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

PETERS, J.—Dan Clifton Robinson, Charles Drivers, Willie Hickman and Fred Guliex were jointly charged with the murder of Lewis Joseph Grego on February 4, 1962. All defendants pleaded not guilty, and were jointly tried by jury. Verdicts were returned finding Robinson, Drivers and

Hickman guilty of murder in the first degree. A mistrial was declared as to Guliex, the jury being unable to agree as to him. The penalty issue was tried before the same jury, and verdicts were returned fixing the death penalty for Robinson and life imprisonment for Drivers and Hickman. Robinson's appeal is automatic under the provisions of subdivision (b) of Penal Code section 1239. Drivers' appeal has been consolidated with Robinson's for review by this court. Hickman has not appealed.

*The Facts:*

The following statement of facts constitutes a summary of the *undisputed* evidence produced by the prosecution.

Hickman was a night porter at the Fox Hills Country Club, in Los Angeles. Grego, the victim, was a bartender at the same establishment. On the evening of February 3, 1962, a private party was in progress at the club. Shortly after one a.m. of the 4th, the party having concluded, there was present on the premises only Mr. Morrisey (the club manager), Grego, Hickman and Arthur Lee Johnson (a second night porter). Johnson was working in a distant part of the clubhouse, and neither heard nor saw anything that occurred during the commission of the crime. Morrisey, Grego and Hickman were together in the vicinity of the dining room, bar and office, preparing to close. Morrisey instructed Hickman to rope off a certain portion of the club parking area, as was the usual custom. Hickman left, ostensibly for such purpose. Grego gave Morrisey the night's proceeds, and Morrisey deposited them in the office safe. As he rejoined Grego in the dining room, three men appeared in the doorway leading from the kitchen. Morrisey saw two of these men clearly, and observed that they could not be recognized because they wore masks made of white material with holes cut for the eyes. One carried what appeared to be a gun. Grego said, "There are three of them." Immediately thereafter Morrisey heard a loud explosion, and turned away. There was a second explosion, and Morrisey was knocked unconscious. He did not regain his senses until several weeks later. He was then in a hospital. When Hickman returned to the dining room area he was met by Johnson, who had come from where he had been working, and the two entered the dining room together. They found Morrisey unconscious on the floor and bleeding from wounds in the back. Hickman telephoned for the police. When the latter arrived they were met by Hickman outside,

and accompanied him back to the dining room area. There they found Morrisey, as described, and also found Grego's body, half sitting and half reclining in a booth. He was dead, killed by a shotgun blast that tore off part of his face and his jaw and which had continued downward through his throat and into his shoulders. Morrisey's wounds were also caused by a shotgun, fired from behind him. An unexpended shell and the remnants of two expended shells were found on the premises. Subsequent police search revealed a Ford automobile on the club parking lot, facing the exit and with its gears jammed in such manner that it could not be driven, and with its rear license plate obscured by means of a white rag. The Ford was registered to one Alfred Campbell who lived in an apartment, which turned out to be in the same apartment house where Hickman lived. Robinson had purchased the Ford from Campbell two days before (on February 2d).

When the police arrived during the early morning hours of the 4th at the address of Campbell, they found Robinson in Campbell's apartment. He had just telephoned the police and reported the Ford as stolen. He readily admitted ownership of the car, and had the keys in his possession. His fingerprints were found in the driver's compartment, and Drivers' fingerprints were found in and around the right-hand front passenger seat and the door. Drivers was Hickman's cousin, and both he and Robinson were frequent visitors at the Hickman apartment. Search of that apartment disclosed a white cotton bag, or portion of a pillow case, containing a piece of rope that matched a similar piece found abandoned at the country club, and which bag matched the material of two of the three masks subsequently found discarded near the scene of the crime. Several weeks later a shotgun was found abandoned in the cemetery across the road from the country club. The gun was so rusted that it showed no fingerprints, but was definitely identified as the property of Robinson's grandfather. Its case was found in Hickman's apartment, and subsequent tests demonstrated that it was the murder weapon. On the morning of the 4th the police received a report of another stolen car which they later recovered in downtown Los Angeles. The point of recovery, the point from which it was taken, and the location of the various objects which had been found near the scene of the crime, taken together, indicated that two men had left the country club via the golf course, utilizing the stolen car as a

getaway vehicle, and that one man had left in the opposite direction, via the cemetery.

In addition to the foregoing, the prosecution introduced transcriptions of extrajudicial confessions and admissions made by Hickman, Robinson and Guliex.[1] These statements were offered by the prosecution expressly only against the particular individual who made the statement, and the court, at the time of admission of each statement properly instructed the jury that it was not to consider anything contained therein as evidence against any other defendant.

As each statement was offered the defendant making it objected on the ground that he had been coerced into making it and that it was involuntary. When such objection was made, the court allowed the defendant involved to present *voir dire* evidence on the allegedly involuntary nature of the statement, carefully explaining to the jury that the testimony was being received for the sole purpose of determining whether or not it had been made voluntarily. At the conclusion of each *voir dire* examination, the trial judge expressed his opinion (out of the presence of the jury) that the statement was voluntary, and allowed the prosecution witness to read the transcript of it into evidence.[2]

The extrajudicial confessions of Hickman, Robinson and Guliex were, except in certain respects hereafter mentioned, substantially similar. Therein those three defendants stated that Hickman, Robinson and Drivers had planned for several weeks to rob the Fox Hills Country Club;[3] that Robinson purchased the Ford from Campbell on February 2d; that sometime on the 3d they decided to consummate their plan that night; that Hickman went to work, pursuant to the plan, at the ordinary time, with the understanding that the other two would drive to the club parking lot later in the evening; that thereafter, and before going to the club, Robin-

---

[1]Drivers refused to make any statement to the police, beyond a denial of complicity. His conversations to that extent, offered as alleged adoptive admissions, are later discussed.

[2]When charging the jury at the conclusion of the guilt phase of the trial, the court instructed the jurors that they were not to consider any extrajudicial statement unless they first found it to have been voluntary, and that even in such case, they were to limit its application to the individual defendant against whom it was admitted.

[3]Robinson's statement differed from that of the other two only in that he specifically refrained from naming his coconspirators, using the phrase ''my partners in crime,'' throughout, for the express purpose of ''taking the rap myself.''

son and Drivers met Guliex, told him of their plan, and persuaded him to join them;[4] that the three arrived at the parking lot sometime before midnight of the 3d, were met by Hickman, and advised by him that a party was in progress, and that it was not yet safe to perpetrate the robbery; that at the time they had with them the shotgun, which was later identified by the police, and a .22-caliber rifle; that the shotgun was loaded and the rifle was not; that sometime after midnight Hickman again came out to the car and advised the others that it was now time to consummate the robbery.[5] From this point on, the statements necessarily differed, for the reason that the three confessing defendants were not together at all times.

According to Hickman, after advising the others that it was time to go in, he left them in order to rope off a separate portion of the parking lot which was out of view of the spot where the Ford was parked. He stated that while he was so engaged he heard what sounded like two shotgun blasts from the dining room area; that he looked in a window and observed Mr. Morrisey attempt to reach for the telephone which was on the office desk, but that Morrisey fell over before he reached the telephone; that he (Hickman) then panicked, and ran to the locker room, where he locked himself in; that sometime later he left the locker room and, on approaching the dining room, saw Johnson; that together they entered the dining room and found Morrisey lying as described by the prosecution witnesses; that they attempted to give him aid, but were unable to help him; that Hickman then telephoned for the police; that after doing so he went outside to await the arrival of the police, whereupon he noted, for the first time, that the Ford had been abandoned near the parking lot exit; that he then reentered the club where he waited until he saw the headlights of a car, at which time he went outside; that he was met by the police in the parking lot, and reentered with them; that after being interrogated by the police, he was taken into custody.

Guliex indicated in his statement that when Hickman told them that the time was ripe, the remaining three alighted from the car and moved toward the kitchen door; that he

[4]Guliex' statement commences at this point for the obvious reason that he had no knowledge of the preceding facts.

[5]In his statement, Hickman identified this moment as the time that Morrisey sent him out to rope off a portion of the parking lot.

(Guliex) had been handed the unloaded rifle, and that one of the others carried the shotgun; that before they entered the club,[6] he (Guliex) decided that he did not wish to continue with the robbery, and attempted to talk the others into leaving; that when he received no response to that suggestion, he turned to leave by himself; that he then heard the two shotgun blasts, and (with the others) ran to the Ford; that the gears of the Ford jammed so that it would not move; that he and Robinson fled on foot, via the golf course; that after leaving the area, they found a parked car with the keys in the ignition; that they took that car, and Robinson drove him to downtown Los Angeles, where they parted company.

Robinson's statement contained most of the matters set forth in the résumé of Guliex' statement, except that it gave no indication of the identities of the other parties, and contained no reference to Guliex' alleged suggestion that they terminate the attempted robbery. In his statement he admitted having done the shooting; although he claimed that he shot as Morrisey was approaching him. He, also, stated that the parties fled, in the manner indicated by Guliex. Neither he nor Guliex mentioned Drivers by name at any point after Hickman indicated that the time was ripe to enter the club.[7]

In addition to the foregoing, the prosecution offered proof of what was intended as an adoptive admission allegedly made by Drivers. Since the objection to this evidence constitutes one of Drivers' principal contentions on appeal, the facts surrounding its admission are set forth in detail.

The prosecution first made an offer of proof in chambers, outside the presence of the jury. It there offered to prove that Drivers stated, when accused of the crime, that he was not ''copping out to nothing,'' claiming that such was admissible as a failure to deny an accusation. Various defendants (including Drivers) objected on the ground that the offered statement was of itself a denial, and hence not subject to the rule authorizing evidence of an undenied (or equivocally answered) accusation. Thereupon the prosecuting attorney repeated the alleged phrases used by Drivers in slightly

---

[6]But Morrisey testified that three men entered the room where he and Grego were at the time of the robbery.

[7]It should be noted that although Robinson admitted the shooting and the use of his grandfather's shotgun, the route by which he and Guliex admitted fleeing was diametrically opposed to the route where the shotgun was eventually found.

different language and context,[8] and it was agreed that the testimony should be elicited in open court, and objections made at the proper points of the examination. Sergeant Wrona of the Los Angeles Police Department was then asked to state his conversation with Drivers at the police headquarters. Before any reply was made, Drivers' counsel asked for permission to examine the witness on *voir dire*. The request was granted, and it was brought out that Drivers had not been apprehended by the police, but had given himself up voluntarily when he learned that the police were looking for him. During that cross-examination the witness was questioned, and answered, as follows:

"Q. ... [Y]ou had a conversation with Drivers at Lennox Station; is that right?

"A. Yes.

"Q. And at that time you told him in substance that you knew what—what had happened out at the Fox Hills Country Club and that he'd better tell you what happened?

"A. No. At the first questioning we asked him where he was and he related what he had done. After Willie Hickman was brought into the room is when Chuck Drivers asked Willie Hickman that [*sic*, if] he, referring to himself, was at the Fox Hills Country Club. Willie Hickman at this time stated yes, he was.

"At this time he said he was not out at the Fox Hills Country Club, and Sergeant Human related to him the incident that occurred and that Willie Hickman had involved him in the crime.

---

[8]On the two occasions on which the prosecuting attorney referred to the alleged conversation he purported to quote Drivers one time as having said, "I'm copping out to nothing even if my own mother said she saw me," and the second time as having said, "I am not copping out to nothing, even if my own mother said I was there." When the testimony was finally produced the witness (Sergeant Wrona) testified on one occasion that Drivers said, "I'm not copping out to nothing even if my own mother told on me," and on another occasion purported to quote Drivers as saying, "I am not copping out to nothing, even if my own mother said it." A fifth version was used by the prosecution, during argument to the jury, at which time the assistant district attorney purported to quote the record as, "even if my own mother said she saw me there." Such five variations of Drivers' alleged remark have little importance, standing alone; but when viewed in light of respondent's arguments on appeal (which rely upon the purported significance of the exact verbiage used, and which will be discussed more fully below) it appears that the alleged remark may not be given the importance which the prosecution would have us place upon it.

"At this time Charles Drivers said, 'I'm not copping out to nothing even if my own mother told on me.'[9]

"Q. In other words, he denied then to you that he had anything whatever to do with the crime that we are interested in in [*sic*] here now?

"A. He did."

Whereupon the prosecution objected and moved to strike the answer for the purpose of the objection. The answer was stricken for that purpose, and before the court was able to rule on the objection, counsel for Drivers withdrew the question, stating that he would reframe it.[10] Thereupon the examination continued as follows:

"Q. ... Did he at any time admit to you that he had any part in this crime that we're interested in?

"A. He did not.

"Q. Didn't he at all times tell you that he didn't know what you were talking about when you questioned him about the gun and also the shooting at the Fox Hills Country Club?

"A. That is true."

Returning to direct examination, the witness testified (over legitimate objections that the questions were leading) that Drivers had made conflicting statements as to his whereabouts on February 2d, 3d and 4th.[11] Counsel for the prosecution then queried the witness as to the asserted failure to

---

[9]In such manner the prosecution witness put in evidence the very statement, the admissibility of which was being tested on *voir dire*. No one seems to have noticed this fact, or the fact that the reply was not responsive to the question. At least no objection or motion to strike was made, all of which leads to the conclusion that counsel for Drivers had lost sight of the purpose of his *voir dire* examination.

[10]The objection that counsel for Drivers made unnecessary was as to the form of the question. Since the witness was on cross-examination, the objection made was not valid, and there seems to have been no reason for withdrawing the question. However, as will be seen below, the fact that Drivers unequivocally denied Hickman's accusation was again made clear on redirect examination.

[11]In addition to the questions being leading, Wrona's testimony clearly indicated that in all of Drivers' repeated statements of his activities during the three-day period there was only one item as to which he gave conflicting answers to the police, and that was regarding the place where he had slept on the night of February 3d-4th. However, his explanation of his activities was such that it was not possible for the police to make an adequate check thereon. The full import of this particular bit of testimony will be more fully discussed at the appropriate point below.

deny an accusation made in his presence, and the following ensued:

"Q. All right, would you relate as best you can the conversation between Willie Hickman and the defendant Drivers?

"A. Yes. At this time Chuck Drivers asked Willie Hickman if he was at the Fox Hills Country Club, referring to himself.

"Q. Excuse me, Drivers asked Hickman?

"A. Yes.

"Q. All right.

"A. And Willie Hickman informed Chuck Drivers that he was also at the Fox Hills Country Club the night of February 3rd, *to which Chuck Drivers stated, 'No, I was not there, and that's that.'* [Italics added.]

"At this time Chuck Drivers was informed of the incident at the Fox Hills Country Club, and that a shooting had occurred, which one person was dead, to which Chuck Drivers said, I am not copping out to nothing, even if my own mother said it.' "

This was the state of the evidence when the prosecution rested. Then, the defendant Hickman commenced his defense, and a most confusing situation developed. His entire direct testimony consisted of his reply to a single question in which he reiterated that his previous testimony, regarding the coercion and force used to secure his confession, was the truth.[11a] He was then cross-examined by the prosecuting attorney. During such examination he continued to reiterate that his confession had been obtained by brutality, threats and refusal of food. However, while insisting that his confession was involuntary, he also admitted that the confession,

[11a]After three questions aimed at calling the attention of the witness to the time and place in question, the direct examination concluded as follows:

"Q. You have previously told the jury some things that happened in the Detective Headquarters before you took the lie-detector test, and you have also told them about some things that happened right after you took the lie-detector test and before you gave this statement that the reporter took down. You remember testifying about those things, do you?

"A. Yes, I do.

"Q. Now, do you wish to change any portion of that testimony, or do you say it's the truth?

"A. It's the truth.

"MR. O'NEILL: I have no further questions."

itself, was true. Objections and motions to strike were made by the codefendants on the ground that the answer was non-responsive. The motions were overruled. The prosecuting attorney then went through the confession, point by point, asking if each statement appearing in the confession was true, and received an affirmative reply to each. The court *sustained* the objections of each of the other three defendants on the ground that as to them, the testimony was hearsay, but allowed the examination to continue and the answers to stand as against Hickman, alone. The court did not on this occasion, however, specifically advise the jury to consider the testimony as limited to Hickman. But, it did state to counsel that it considered that the objections and the rulings were continuous, and applicable to the entire line of examination.

As the cross-examination continued, the questions changed from inquiry as to whether a particular fact set forth in the recorded confession was true, to an inquiry concerning the truth of the same fact, without any reference to the extra-judicial statement. At just what point the prosecuting attorney ceased referring to the confession obtained by the police and commenced to obtain answers that amounted to a judicial confession, is not clear from the record. It is clear, however, that the cross-examination, which commenced with an inquiry into the truth of the extrajudicial confession, ended with testimony from Hickman that was identical to the facts set forth in the extrajudicial statement. When the change in the type of cross-examination first became apparent, the co-defendants objected on the ground that the questions were beyond the scope of the direct examination. Even though that direct had been limited to the one proposition that Hickman's extrajudicial statement had been obtained by coercion, the court ruled that questions designed to obtain a piecemeal confession of the crime were proper cross-examination, and that the answers thereto *were binding on all defendants*. To complicate the matter, the court overruled further objections as to the form of the questions, holding that great latitude would be allowed on cross-examination. Thus, the prosecution was able to ask leading questions, and to accomplish a "rehabilitation" of Hickman, and to obtain a complete confession from the witness stand, which confession implicated each of the other defendants by name.

By way of cross-examination of Hickman's so-called "defense," the defendant Robinson attempted to prove (through questions to Hickman) that the latter had, on the

previous day, made a bargain with the prosecution for a lesser charge in return for a confession which would implicate the codefendants. He was unable to obtain any such admission from Hickman.

Guliex then put on a defense not material to this appeal.

Robinson presented a defense in which he did not himself take the stand, but which consisted entirely of a further attempt to prove a deal between Hickman and the prosecution. The prosecution did not undertake to rebut this defense, but in a proceeding labeled (in the transcript of record) as "Hickman's Rebuttal of Robinson's Defense," Hickman produced both prosecuting attorneys to deny that any deal had been made.[12] Then Robinson, by way of surrebuttal, called Drivers to the stand for the limited purpose of testifying that on the previous day, in open court, he had overheard Hickman's counsel attempting to make such a deal with the prosecuting attorneys. Robinson then called Drivers' attorney to the stand to testify that, on the previous day, Drivers had reported to him the fact that he had overheard such deal. On cross-examination Drivers' counsel stated that when his client told him what he thought he had overheard he "didn't believe it."

Drivers offered no defense, and did not take the stand except as a witness called by Robinson for the limited purpose mentioned above.

After arguments and instructions the jury returned their verdicts of murder in the first degree against Robinson, Hickman and Drivers. The penalty phase of the trial was short and without incident.[13] At its conclusion the jury assessed the death penalty against Robinson, and life imprisonment for Hickman and Drivers. As stated above, Hickman has not appealed.

*The Issues*:

The principal issues on these appeals involve, first, the voluntary nature of the extrajudicial statements and their admissibility. Included therein are questions regarding the

---

[12]No motion was made to reduce the charge from one of murder in the first degree; and at the penalty phase of the trial the prosecution requested the death penalty for all remaining defendants, including Hickman.

[13]The appellants claim that the prosecution resorted to improper argument in this phase of the trial, and the facts upon which they rely will be set forth in discussion of that claim.

propriety of Hickman's judicial confession and its admissibility against each appellant. When these various issues have been resolved, only then can we determine the sufficiency of the evidence as to each of the appellants. In arguing the sufficiency of the evidence, the parties raise subissues relating to the testimony of accomplices and the law of conspiracy. They also contend that prejudicial error in the instructions requires reversal.[14]

In addition to the principal issues last enumerated, appellants have made several assignments of error which are without merit. These include the contentions that reversal is required because the court overruled the challenge which they made to the jury panel at the commencement of the trial, that the testimony of Hickman was proved to be false and should have been excluded, that the prosecution indulged in improper argument, that the prosecution should be bound by Drivers' extrajudicial denial of complicity because the same was produced as a portion of its case in chief, and that Drivers was denied effective assistance of counsel. These contentions, all without merit, can be disposed of quickly.

On the first morning of the trial, and before selection of a jury had commenced, the several defendants (who were all Negro) challenged the entire panel on the sole ground that Negroes were systematically excluded therefrom. The challenge was made on information and belief, only, and no evidence was offered. In the absence of the showing subsequently made by the prosecution, the record merely showed that there were no Negroes on either of the two panels which were called to try these defendants. The question of whether there has been a systematic racial discrimination in the selection of jurors must be determined from the facts of each particular case (*Patton* v. *Mississippi*, 332 U.S. 463 [68 S.Ct. 184, 92 L.Ed. 76, 1 A.L.R.2d 1286]), and it is incumbent upon a defendant to establish such facts. Here, the appellants not only failed to establish any facts whatsoever, but they made no attempt to rebut the showing gratuitously made by the prosecution. From that showing it was made to appear that the practice used in the selection of jurors was designed to obtain a cross section of the registered ..

---

[14]Actually, several of the mentioned assignments were made by Drivers, only. Because Robinson's appeal is from a death sentence, it is proper that we consider all errors that may appear in the record, even though not raised by him.

voters, without consideration of race, color or creed.[15] In *People* v. *Burwell*, 44 Cal.2d 16, 41 [279 P.2d 744], it was held that a stronger showing than was made by defendants here was insufficient to sustain a contention that there was a systematic and purposeful attempt to exclude Negroes from the grand jury. Because appellants here offered no proof of their allegation that Negroes were excluded from jury service, the authorities on which they rely are not in point. On the contrary, this case comes within the rules of *People* v. *Carter*, 148 Cal.App.2d 949, 951 [307 P.2d 670], and *People* v. *Frye*, 218 Cal.App.2d 799, 802 [32 Cal.Rptr. 699], which hold that such a challenge to a jury panel must be factually supported.[16]

The claim that the testimony of Hickman must be disregarded because some of his testimony was shown to have been false is without merit. Appellants rely on the fact that the prosecution offered convincing evidence that Hickman's claims of brutality, and other unlawful means used to obtain a statement from him, were untrue, and yet rehabilitated him for the purpose of obtaining an ''in court'' confession which implicated his codefendants. No authority is cited by appellants to uphold their contention that the jury may not accept one portion of a witness's testimony while rejecting another. The authorities are to the contrary. The point which appellants attempt to make here goes not so much to the rejection of Hickman's testimony because it is unworthy of belief, as it does to the question of whether it was proper cross-examination. That point will be discussed later.

Appellants claim that one of the prosecuting attorneys committed prejudicial misconduct when, in his argument to the jury during the penalty phase of the trial, he made some reference to the fact that the jury had been selec-

[15]According to the testimony produced by the prosecution, the jury commissioner obtains a tentative panel by requesting the registrar of voters to submit every fourth name from every eighth precinct, commencing with a precinct chosen by chance. The individuals so submitted are then screened for personal qualification, which does not include screening for race, color or creed. No mention was made, by either prosecution or defendants of the percentage of Negroes who reside in such precincts, or the percentage who are registered voters.

[16]See also, *People* v. *Hess*, 104 Cal.App.2d 642, 669 [234 P.2d 65], where it is said that the jury commissioner is invested with full power to decide as to who are qualified to serve as jurors, and that in the absence of a showing that his selection is fraudulently made, his actions will not be invalidated.

ted as the arm of society appointed for the purpose of assessing the death penalty. A reading of the record at this point indicates that appellants have misconceived the purport of the prosecutor's remarks. He told the jury, in substance, that they were an arm of society, that society had provided for the death penalty in certain cases, and that they had been appointed to determine whether or not this was such a case. This was proper argument.

Appellant Drivers' contention that the prosecution was bound by his extrajudicial statements because the same were produced during its case in chief, misconceives the point at issue. Respondent argues that it was not bound because portions of that statement came in during Drivers' counsel's cross-examination of the witness. It is true that the record indicates that the statements were repeated on several occasions, both on direct examination and on cross, but what both counsel overlook is that this is not the point at issue. The prosecution has not claimed (and does not claim) that it is not bound by Drivers' extrajudicial statements. It has attempted to use the same to prove an alleged admission by reason of failure to deny an accusation. Drivers now wishes to bind the prosecution with that testimony because he sees in the remarks an unequivocal denial of the accusation. The real issue is not who is bound by the testimony, but whether or not there was a denial of an alleged accusation. This phase of the problem is discussed later.

 The final contention that lacks merit relates to the claim that Drivers was denied effective assistance of counsel when his attorney was required to testify. The claim is not made that the mere calling of Drivers' counsel to the witness stand denied the client the effective assistance of counsel.[17] Rather, it is urged that when counsel testified that he did not believe what his client had told him, he placed his client in such a light that the jury could not possibly believe in his innocence. In this respect, Drivers misinterprets the record. He interprets counsel's testimony to be that he did not believe in the veracity of his client. The record shows the statement (given in reply to a question calling for counsel's reac-

---

[17]Had Drivers, on appeal, contended that it was error to call upon either Drivers or his counsel to testify, it would be proper to discuss here the authorities on that point. But such claim cannot be made for the reason that both Drivers and his counsel acquiesced in the procedure, without comment or objection, *even after having been warned by other counsel* (on the record, but out of the presence of the jury) *that such a procedure was improper.*

tion to the information given by his client) was, "Frankly, I told him I didn't believe it." Read in context, this statement meant that the witness did not believe that Hickman's counsel had made a deal with the prosecuting attorney. It was not an expression of disbelief in his own client's veracity; it was a statement of his doubt of the conclusion reached by his client. Since Drivers had reported his own deductions, made from observations in the courtroom, the expression could not have been interpreted by the jury to reflect the attorney's doubt of the client's veracity. It cannot be contended successfully that Drivers was denied effective assistance of counsel.

*The Voluntary Nature of the Extrajudicial Statements*:

■ The contention is that Robinson's extrajudicial statement should have been excluded because it was involuntary.[18] Such contention overlooks the manner in which the statement was admitted. The trial judge allowed the parties to produce evidence in a *voir dire* proceeding before determining whether he would allow the extrajudicial statement to be read into evidence. He advised the jury that the evidence thus to be produced was received for the sole purpose of determining whether the alleged statement was voluntary or involuntary. The evidence so produced was in direct conflict, and the trier of fact certainly had the right to accept either the prosecution's version or that of Robinson and his witnesses. This constituted a simple factual issue. At the conclusion thereof, the trial judge expressed to counsel, and out of the presence of the jury, his disbelief of Robinson's claims. Under proper instructions he allowed the jury to determine whether or not the statement was voluntary. The parties, in their briefs, argue the merits of the facts testified to by the various witnesses. But we are not concerned with that question.[19] That was the sole concern of the jury. The cases

[18]Because Hickman and Guliex are not parties to this appeal, and because the trial judge limited the applicability of their extrajudicial statements, appellants do not discuss the admissibility of the latter. However, everything that is said here is equally applicable to all of the extrajudicial statements except that of Drivers.

[19]There is no substantial evidence of coercion. Not only was Robinson's testimony in this regard unconvincing, and thoroughly rebutted, but the admitted circumstances militate against any inference of coercion. All of the alleged acts which Robinson claimed as constituting coercion occurred prior to his several refusals to make any statement. Subsequently, he was told that Hickman had confessed, and at that

on which appellants rely deal with claims of coercion in which the facts were not in dispute. While it is true that the prosecution has the burden of proving that the alleged confession was voluntary (*People* v. *Rogers,* 22 Cal.2d 787 [141 P.2d 722]), the trial court here required the prosecution to produce such evidence before allowing the confession to go before the jury. It is the function of the jury, and not of this court, to choose between the conflicting testimony of the parties. The extrajudicial statements and confessions of the various defendants were properly admitted. If the jury believed any one or more of them to have been involuntarily made, it must be deemed to have rejected the same under the court's instructions to that effect. It was also instructed that any statement which it believed to have been voluntarily made was to be considered only as against the particular defendant who made the same. Thus, Robinson's statement was either rejected by the jury on the ground that they believed it to have been made under coercion, or it was accepted and considered only as against him. In no event could the jury have considered that statement in determining the question of Drivers' guilt. Insofar as Robinson's appeal is concerned, there was no error in the refusal to exclude his statement.

*Hickman's Judicial Confession:*

As stated above, when Hickman took the stand in his own defense, his direct testimony was strictly limited to the claim that his extrajudicial confession was coerced. Since that matter had already been completely covered on *voir dire* during the presentation of the People's case, the reason for offering this defense is not readily understandable. However, he so testified, and at the conclusion of his direct, the prosecution cross-examined. Over objection, the court allowed the prosecuting attorney to elicit the fact that, regardless of the voluntary or involuntary nature of the confession, the facts stated therein were true. Undoubtedly that ruling was predicated on the theory that the truth or falsity of the statement is a fact from which the jury might infer that it was voluntary. For such purpose it was a proper subject of cross-examination. But, in allowing such cross-examination, the court expressly sustained the objections of the three codefendants, ruling that the subject was hearsay as to them, and that the

---

time, and without further coercion, Robinson requested the opportunity to ''take the rap'' himself, and clear his friends. His confession (which did not name the others) followed.

matter was admitted solely as against Hickman. Subsequently, when the questions were shifted to elicit the truth or falsity of those same facts, without regard to whether they were contained in the extrajudicial confession, the court continued to rule the cross-examination proper, and held that the answers thus elicited were now binding on all defendants. If the first portion of that ruling was correct, there was no error in the second; for the factual testimony of any witness, given in open court, is not hearsay. But there is a grave question as to whether the last portion of the cross-examination was within the scope of the direct. The direct went only to the voluntary or involuntary character of the extrajudicial confession. The truth of that confession having been established, no further cross-examination was necessary or proper. Furthermore, the truth or falsity of any fact, without relation to the extrajudicial statement, bore no relationship to the matter developed on direct.

By authorizing the cross-examination to the extent set forth, the trial court allowed the prosecution two distinct and unwarranted advantages. In the first place, had it not obtained the testimony by cross-examination, the prosecution could not have produced this most compelling portion of its case. It could not have examined Hickman on direct, because it could not have called him as a prosecution witness except at his request (*People* v. *Talle,* 111 Cal.App.2d 650 [245 P.2d 633]). Secondly, assuming the unlikely event that Hickman would have voluntarily offered himself as a prosecution witness, the prosecuting attorney would have been unable to elicit the information from him by means of leading questions and similar forms of cross-examination which were utilized in the instant case. Review of this portion of the record raises a grave doubt that Hickman's judicial confession (i.e., that portion of his examination which was admitted as against all codefendants) could have been obtained had the prosecution been confined to the ordinary rules of direct examination.

From the foregoing analysis we must conclude that the trial court erred, so far as the two appellants are concerned, in allowing, over proper objection, cross-examination of Hickman in regard to the facts of the crime, as distinct from the sole matter touched upon in his direct examination. Was such error prejudicial? This depends upon whether the evidence, exclusive of that which was improperly received, was sufficient to sustain either conviction, and whether the im-

proper receipt of Hickman's testimony can be said to have affected the jury's verdict.

*Instructions to the Jury:*

██ Before turning to a review of the sufficiency of the evidence, it is necessary to determine appellants' assignments of error regarding the jury charge, for the challenged instructions bear directly upon those portions of the evidence which the jury may have considered as against the respective defendants.

The court instructed that Hickman's testimony, given in court on cross-examination (as related immediately above), might be considered as binding on all defendants. The court continued with the admonition that "If you find that the crime of murder was committed, and *if you further find that the defendant,* WILLIE WARNER HICKMAN *was an accomplice* in the commission of that crime, *then as against codefendants* DAN CLIFTON ROBINSON, FRED GULIEX and CHARLES DRIVERS, *his testimony must be corroborated . . . .*" (Italics added.) The vice claimed is that the court, by the italicized portion of the quoted instruction, invited the jury to speculate upon whether or not Hickman was an accomplice, and implied that if they found him *not* an accomplice, they could convict the others on his uncorroborated testimony. Hickman was, of course, bound by his extrajudicial confession, the truth of which he admitted. That testimony made Hickman an accomplice, as a matter of law, and the court should have so instructed the jury. By telling the jury that corroboration of his testimony was required only if they found him to be an accomplice, the court impliedly and erroneously authorized the jury to find him *not* an accomplice, thereby making corroboration unnecessary. The fact that the court may have, thereafter, given either a proper or an improper definition of accomplice does not cure the error.[20] It only emphasizes it, for such definition serves to strengthen the thought that the jury was the sole judge of whether or not Hickman was an accomplice. In fact, one of the defining instructions advised the jury that "whether or not any witness in this case was an accomplice as defined in these instructions is for the jury to determine from all of the testimony and circumstances as shown by the evidence." That statement was incorrect, not only for mak-

---

[20]The court gave several different instructions on the definition of an accomplice, some correct and some subject to doubt. For the reason that no such definition should have been given in any event, we do not pass upon the propriety of each such definition.

ing the jury the judges of a matter of law, but also because it failed to exclude from the jury's consideration such portions of the evidence as had been admitted only as against a certain defendant or defendants. But the important fact is that Hickman, Robinson and Guliex were all accomplices as a matter of law (each by reason of his own confession, as well as by reason of other testimony). The court should not have invited the jury to speculate on who was and who was not an accomplice. The fact that the jurors did so speculate is inherent in their inability to reach a verdict against Guliex. His extrajudicial confession was not claimed to have been involuntary. It was binding on him. He placed himself in the conspiracy and at the scene of the crime. He claimed, only, that he sought to withdraw at a time when it was legally too late to escape the consequences of his complicity. Legally, if believed, he was an accomplice, and guilty. In his case, some of the members of the jury must have accepted the trial court's invitation, and determined that Guliex was not an accomplice. By the same token, it may have determined that Hickman was not an accomplice, and that therefore his testimony implicating his codefendants needed no corroboration. ■ In this situation, the language of Justice Edmonds in *People* v. *Rogers, supra,* 22 Cal.2d 787, 807, is in point: ''Error in an instruction which ordinarily would not prejudice the rights of a defendant may justify a reversal of the judgment where the jury is misdirected or misled upon an issue vital to the defense and the evidence does not point unerringly to the guilt of the person accused.'' Although not on all fours, that case and this have certain elements in common, in that in *Rogers* there was also evidence of involuntary confessions and determination of issues which the court gave to the jury, and of other issues which it kept from them. In such cases care should be taken not to confuse the jury as to the limit of its prerogatives as the fact finder. Respondent's reliance on *People* v. *Richardson,* 182 Cal.App.2d 620 [6 Cal.Rptr. 61], is misplaced. That case states that if the undisputed evidence establishes that a witness is an accomplice the jury should be so instructed (citing authorities for the proposition). It does not appear that the court (in that case) invited the jury to speculate on whether the witness was an accomplice. And, under the peculiar facts of the case, the appellate court found that defendant was not prejudiced by the failure to admonish the jury that the witness was an accomplice.

In the instant case, the court's error in authorizing the jury to find that Hickman may not have been an accomplice denied the codefendants the protection intended by Penal Code section 1111.[21] For if the jury found that Hickman was not an accomplice, then they must have felt entitled (under the balance of the instructions given to them) to convict the others on his confession alone.

The error was compounded by the court's instructions regarding the law of conspiracy. At the outset of the trial the prosecuting attorney stated that he intended to rely upon the law of conspiracy. He did not explain his purpose, but it is to be supposed that he intended to take advantage of the rule that in a conspiracy all of the conspirators are bound by the extrajudicial statements of each of the conspirators. But, surprisingly, the prosecution made no attempt to offer evidence of a single extrajudicial statement except as being specifically limited to the defendant who made the same. In each instance it conceded (and the court ruled and later instructed) that the extrajudicial statement, if found to be voluntary, was admitted solely as against the individual, and constituted hearsay as to the codefendants. Furthermore, none of the defendants were charged with conspiracy, and the prosecution made no effort to amend in this regard. For these reasons, the question of conspiracy was not involved. In spite of this fact, the court gave 14 instructions on the law of conspiracy, all at the request of the prosecution. This was more instructions than were given on any other issue in the case, and included, among other things, instructions on the definition of conspiracy, the rule that an absent conspirator is jointly responsible for the acts of his coconspirator committed within the scope of the conspiracy, the rule that conspiracy may be proved by circumstantial evidence, and several instructions designed to invite the jury to determine (as an issue in this case) whether a conspiracy existed and who were the conspirators. On the other hand, the charge did not include a single instruction to the effect that a defendant (whether charged with conspiracy or not) may not be held to be a conspirator on the uncorroborated testimony of an accomplice. It is true, as argued by respondent, that once a

---

[21]"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

conspiracy has been proved, a conspirator's extrajudicial statement may be introduced against his fellow conspirators, in spite of the hearsay rule. But the test for sufficiency of the corroborating evidence to prove conspiracy in the first instance is no different from that required to prove any other crime (*People* v. *MacEwing,* 45 Cal.2d 218 [288 P.2d 257]). Thus, even if Hickman's confession given in open court was admissible as against Robinson and Drivers, it required corroboration before the jury could find that those defendants were conspirators. The failure to so advise the jury, in addition to the fact that the entire issue of conspiracy was moot, compounded the error. At best, the instructions must have confused the jury as to the issues in the case, and should not have been given for that reason (*People* v. *Sanchez,* 30 Cal.2d 560, 572 [184 P.2d 673]). In their worst light they constituted an invitation to the jury to find that Robinson and Drivers were members of a conspiracy, predicated solely on the uncorroborated testimony of Hickman, and so guilty of the charge of murder.

So viewed, the instructions were highly prejudicial. To this, respondent offers but two arguments. It points out that the defense did not offer any instructions on conspiracy. Such is no answer if the issue was not a proper subject for instructions in the first instance. Furthermore, it contends that conspiracy need not be charged in order that proof thereof may be shown, and that instructions may be properly given when the proof shows that defendants did in fact conspire. Those statements are true, and the authorities cited for both propositions so hold. But the point here is that conspiracy never did become an issue for the reason that, for all its talk about it, the prosecution never did attempt to prove anything under the rules of conspiracy.

*The Sufficiency of the Evidence Against Drivers:*

It will be recalled that when the prosecution rested, very little evidence had been admitted as against Drivers. The extrajudicial statements and confessions of Hickman, Robinson and Guliex had been admitted as binding only on the respective individuals. The evidence which linked Drivers with the crime consisted only of : (a) his fingerprints on the Ford automobile, (b) testimony of the police that Drivers gave conflicting and evasive replies when queried in regard to his whereabouts during the weekend of the crime, and (c) the alleged adoptive admission set forth hereinabove. Drivers offered no evidence in rebuttal of the People's case. Thus, if

his codefendant Hickman had not taken the stand in his own defense, there would have been nothing in the record binding on Drivers other than the three items mentioned immediately above. As a result of Hickman's defense there was admitted, as against all defendants, the judicial confession in which each defendant was specifically named as a participant who was present at the attempted robbery which resulted in the killing of Grego. We have already held that the latter testimony was obtained through improper cross-examination, erroneously admitted over valid objection. But even if such testimony had been properly admitted, and was binding on Drivers, we find that there was insufficient evidence to sustain his conviction. Hickman's confession from the witness stand constituted neither more nor less than the testimony of an accomplice. As such, it was insufficient to sustain a conviction unless corroborated by other evidence connecting Drivers with the commission of the crime (Pen. Code, § 1111, *supra,* fn. 21).

Respondent claims that the necessary corroborating evidence is to be found in the fingerprints, the evasive replies and the alleged admission by failure to deny an accusation made in his presence. None of those three items, independently or cumulatively, constituted the requisite corroboration.

The fingerprints showed no more than that Drivers had been present in or about the Ford on some recent date. The fingerprint expert produced by the prosecution testified that he could not place the date on which the prints were put on the car, but that he believed them to be relatively recent because of the fact that the car was out of doors. He was of the opinion that prints on such a surface disappear sooner when exposed to the elements, but was still unable to state that they had been placed on the car within the last day or two prior to the date of the crime. As opposed to this, the evidence (also produced by the prosecution during its case in chief) showed that Drivers was Hickman's cousin, and spent much time at the Hickman apartment which was in the same building as the apartment of Campbell (the original owner of the car), and that Campbell was also a frequent visitor to the Hickman apartment. Thus, Drivers' fingerprints on the Ford are as equally susceptible to an inference that they came there innocently, as they are to any inference that their presence connects defendant with the commission of the crime. In addition, the prosecution witnesses (police sergeants) testified that when they queried Drivers concerning his move-

ments during the evening of the crime, his reply included a claim that he and Robinson, together, had eaten dinner at Hickman's, and that immediately after dinner took one of the Hickman children, in Robinson's Ford, to visit a friend, after which Robinson and Drivers parted company for the evening. That portion of Drivers' explanation of his whereabouts was not subject to the claim that Drivers told conflicting stories as to his movements during the weekend. It was definitely subject to check by the police, inasmuch as it placed Drivers in the company of various persons, some of whom were unconnected with the crime or the family. Yet the prosecution offered no evidence that such portion of Drivers' explanation of his whereabouts was untrue. The truth or falsity of this portion of his explanation is unimportant. The important feature is that the explanation (evidently accepted by the police) shows that Drivers' fingerprints could have been placed on the Ford in a manner entirely unconnected with the crime. To hold that the presence of those prints connects him with the commission of the crime is tantamount to saying that the fingerprints of any relative of a person known to have committed a crime, found on the automobile of such person, tend to connect the relative with the crime, even though it is known that the relative has had the opportunity to be in and out of that car on various occasions other than during the commission of the crime. Such a theory is unsound. Certainly association with a criminal is not to be equated with connection with the crime. Moreover such a contention asks the jury to speculate on how and why the fingerprints appeared, with no evidence at all on that question. Even if the fact of the fingerprints be deemed to cast suspicion, even grave suspicion, on Drivers, such is insufficient.[22] " ' "It is necessary that the evidence corroborating an accomplice shall connect or tend to connect the defendant with the commission of the crime. Corroborative evidence is insufficient where it merely casts a grave suspicion upon the accused. It must not only show the commission of the offense and the circumstances thereof, but must also implicate the accused in it. . . ." ' " (*People* v. *Robbins*,

---

[22]In his argument to the jury on this point the prosecuting attorney stated the fingerprints were very important evidence as to Drivers, "placing him in this car at the scene of the crime, possibly." Such admission that the evidence only "possibly" connected Drivers with the crime indicates that even the prosecutor viewed the fingerprints as merely casting "suspicion on the accused."

171 Cal. 466, 470 [154 P. 317].) ██ At best, the finger-prints merely placed Drivers in the car at some time prior to the time the car was discovered. According to the inferences to be derived from the testimony of the prosecution's witnesses, that could have been around the dinner hour, and before Drivers claimed to have parted company with the man who confessed to the commission of the crime some five or six hours later. This merely proves association. ██ In *People v. Reingold*, 87 Cal.App.2d 382, 399-400 [197 P.2d 175], it was said: "There can be no question that it is insufficient corroboration merely to connect a defendant with the accomplice or other persons participating in the crime, but evidence independent of the testimony of the accomplice must tend to connect a defendant with the crime itself, and not simply with its perpetrators. It is not with the thief that the connection must be had but with the commission of the crime itself."[23]

██ The testimony of the police to the effect that Drivers gave two conflicting versions of his movements on the weekend of the crime does not satisfy the requirement that the accomplice's testimony must be corroborated. The police were here testifying to an extrajudicial interview with Drivers, which took place after the latter voluntarily turned himself in to the police department. When the witness (Sergeant Wrona) was asked to point specifically to the conflict in Drivers' statements which indicated untruth, he was able to point to but one conflict in the repetition of a narrative covering Drivers' movements for three days (i.e., the place in which he slept during the early morning hours of February 4th). Respondent contends that this is corroborative evidence for the reason that it indicates a guilty frame of mind. Of course, a guilty frame of mind may be proved, in proper circumstances, by evidence that the defendant made inconsistent or conflicting statements. But ordinarily that rule is applied in relation to circumstantial evidence of the guilt of a defendant who has otherwise been connected with the crime. Where, as here, it is offered in corroboration of the testimony of an accomplice a necessary element is lacking. At best, it tends to prove that Drivers, while talking to the police, had a guilty frame of mind. But in regard to what? It

---

[23]See also *People v. Braun*, 31 Cal.App.2d 593 [88 P.2d 728], holding that evidence tending to show that defendant associated with actual perpetrators of the crime raised only a suspicion of guilt, and hence was insufficient to corroborate an accomplice's testimony.

may be reasonable to assume that he had in mind some activity which he desired to hide from the police. But, there is no reasonable inference that his conflicting replies were made for the purpose of hiding connection with the crime with which he is now charged. To hold that such is inferable from his replies is to put on him the burden of proving that he had no connection with the crime, whereas the burden is on the prosecution to produce corroborating evidence which, of itself, connects him with this specific crime. Such corroborating evidence must not only connect him with the crime with which he is charged, but it must do so without aid or direction from the testimony of the accomplice (or accomplices) whose testimony is to be corroborated (*People* v. *Lyons,* 50 Cal.2d 245, 257 [324 P.2d 556] ; *People* v. *Brown,* 49 Cal.2d 577, 583-584 [320 P.2d 5] ; *People* v. *MacEwing, supra,* 45 Cal.2d 218, 223-225). *People* v. *Santo,* 43 Cal.2d 319 [273 P.2d 249], is not in point. There it was held that the defendant's statements to the police and other acts were of such a nature that they corroborated the testimony of the accomplice. But in that case the court pointed out that the independent testimony which was sufficient to connect defendant with the crime consisted of certain admissions made to the officers, together with a rigged alibi so false that it stretched the credulity of this court, and flight by the defendant after she knew that she was suspected. Here none of those elements are present. Drivers did not make any admissions. Instead of fleeing, he turned himself in when he learned that the police were looking for him. If his "alibi" was a rigged one, the prosecution offered no evidence that they had checked it and found it to be false. The single inconsistency in his repeated narrative to the police shows no more than a sense of guilt of something he wanted to hide. There is nothing in such inconsistency to connect Drivers with this crime, unless aid and direction is borrowed from the testimony of Hickman.

 This leaves, as the only claimed corroboration, the alleged admission by reason of failure to deny a claimed accusation. Neither appellant nor respondent has properly briefed this point, but an examination of the testimony shows that here there was no adoptive admission. To constitute such the evidence must show that an accusation was made under such circumstances that the defendant heard and understood the same, and had the opportunity to deny, and that, having such opportunity, he either failed to reply or made a reply so equivocal as to be consistent with guilt. In

the absence of these factors, the evidence would be inadmissible (*People* v. *Briggs*, 58 Cal.2d 385, 407-409 [24 Cal.Rptr. 417, 374 P.2d 257]). ▓▓▓ When such evidence is offered (and it was here offered in chambers prior to production) it is the duty of the court to determine whether all of the necessary elements are present before allowing the jury to hear the testimony (*id.*, at p. 408). The failure of the court to do so in this case may constitute sufficient prejudicial error to require reversal.[24] For when the evidence was admitted it became clear that when Hickman confronted Drivers with the statement that he (Drivers) was at the scene of the crime, Drivers unequivocally replied, ''No. I was not there, and that's that.'' The unequivocal denial having been made, there was neither room for testimony of Hickman's accusation, nor for testimony regarding the balance of the conversation. It is worthy of note that the very police officer who was called upon to testify did not claim that there had been a failure to deny an accusation. He stated unequivocally both on direct and cross-examination, that Drivers at no time admitted participation in the crime, and at all times denied it. Thus, the claim that the conversation constituted an admission by failure to deny is not borne out by the very witness called in an effort to prove the same.

▓▓▓ Some mention should be made of the five variations of the reply that is alleged to have been made. Immediately upon making the reply quoted above, Drivers was advised by the police sergeant that a murder had taken place and that he was suspected of complicity. He is alleged to have replied in one or another form of the phrase, ''I am not copping out to nothing, even if my own mother said it.'' In all five statements he used some form of the phrase to ''cop out.'' The same police sergeant, when testifying at another point in the trial, was qualified by the prosecution as an expert on language of the underworld, and testified that the verb to ''cop out'' is synonymous with ''to admit.'' Thus, by its

[24]Although Drivers has not raised the point, the giving of Instruction No. 21 (advising the jury that it might find an admission in a defendant's failure to unequivocally deny an accusation) also constituted prejudicial error. The record contains no evidence that any other defendant failed to deny (or made an equivocal denial to) an extrajudicial accusation. This instruction could only apply to Drivers. As already pointed out, there was absolutely no evidence on which such a theory could be sustained, yet the prosecuting attorney argued the point, and was sustained in his argument by this instruction. We reversed in *Briggs* for less.

own definition, the first portion of Drivers' answer meant only that he had nothing to admit. Because of this dilemma, respondent bases its entire argument on the contention that the phrase "even if my own mother told on me" infers an admission of guilt, because otherwise there would be nothing for defendant's mother to tell. Even if the phrase on which the prosecution seizes is subject to that inference it was but one of the versions which the witness used. The same inference is not to be found in the phrase "even if my own mother said it," or in the other phrases used by the prosecutor and his witnesses herein ("if my mother said she saw me," "if my own mother said I was there," or, "I don't care who saw me there"). It would appear that the witness was not attempting to quote Drivers' statement verbatim, but was simply trying to indicate the substance of the conversation. If the trained detective sergeant did not infer any admission in the conversation which he had with Drivers (and he testified that he did not), certainly the jury should not be permitted to indulge in such inference. To assume that the questionable quotation infers an admission of guilt, and thus placing this man's life in jeopardy, would be to go far beyond the rules which require independent proof to corroborate the testimony of an accomplice.

The respondent makes certain other contentions on this issue which are clearly devoid of merit. Thus, respondent claims that the independent evidence shows that the crime was committed by three persons. This is true, since Morrisey so testified, although he was unable to identify any of the three. Respondent then argues that the independent proof shows that two of the criminals escaped in one direction and the third in another direction. This is also true. Respondent then argues that since Robinson and Guliex have both confessed to having escaped together, via the golf course, the third, who escaped via the cemetery, must have been Drivers. Such argument is unsound. In the first place, the confessions of Robinson and Guliex were not admitted against Drivers. Even if they had been, they do not indicate that Drivers escaped by the alternate route, since that is the route on which the shotgun was found, and no one disputes the fact that Robinson carried and used that gun. The argument simply indicates that some third person left via the cemetery. In order to connect Drivers with the crime it is necessary that that particular evidence be given both meaning and direction

by the testimony of Hickman, who placed Drivers at the scene of the crime. Thus it is not corroborating evidence.[25]

The only other argument that respondent makes in regard to corroboration seems to be connected in some vague way with the rules of conspiracy. The applicability of such argument is not apparent. As already pointed out the prosecution accomplished nothing when, at the start of the trial, it announced that it would rely on the law of conspiracy. At no time did it offer evidence by which a conspiracy might be proved against Drivers, other than the accusations of coconspirators. Three extrajudicial accusations were admitted under the express ruling that they were limited to the case against the defendant whose statement was being admitted. The fourth was Hickman's judicial confession made in open court. Although we have found it to have been improperly admitted for other reasons, it did not require any rule of conspiracy to make it binding against a codefendant.

Thus it is clear that the evidence is insufficient to sustain the conviction of Drivers. Even if we were to consider Hickman's judicial confession as properly admitted against Drivers, it constitutes as a matter of law the testimony of an accomplice, uncorroborated by competent evidence tending to connect him with the commission of the crime. Without Hickman's confession there is nothing in the record on which to convict Drivers other than the extrajudicial statements which, concededly, were not binding upon him.

*The Sufficiency of the Evidence Against Robinson:*

Much that has been said in regard to the evidence admitted against Drivers is equally true in regard to Robinson. However, there is one important distinction between the

---

[25] This very argument by respondent indicates a failure to understand the basis of the rule requiring corroboration of an accomplice's testimony. The need for the statutory requirement has been expressed as a check against the possibility that one confessedly guilty of a crime may implicate another for the sole purpose of gaining leniency. Respondent's argument at this point overlooks the very real possibility that Hickman, himself, may have been the third man. No one ever saw him in the locker room during the interval immediately following the shooting. Neither the extrajudicial statement of Guliex nor that of Robinson negatives the possibility that Hickman was the third person at the shooting. The facts here argued by the prosecution are equally susceptible to a theory that Hickman was at the shooting, picked up the shotgun, went immediately to the cemetery where he discarded the gun, mask and other paraphernalia, and then returned to the club to telephone the police.

two cases. Robinson made an extrajudicial statement amounting to a confession, and Drivers did not. We have already held that the trial court properly admitted evidence of Robinson's confession, subject to its instructions that the jury must first determine that it was voluntary before it could consider it as binding upon Robinson. If the jury rejected Robinson's claim that his confession was coerced, then there was no need for it to rely on the extrajudicial statement or judicial confession of an accomplice; and hence no need for us to apply the rule that an accomplice's testimony must be corroborated. In such event, Robinson's confession, together with the clear and convincing proof of the corpus delicti, was sufficient to sustain his conviction. In addition thereto, the undisputed evidence placed him at the scene of the crime. He was the owner of the Ford which was found, with gears jammed, at the exit of the club parking lot. When the police arrived at Campbell's apartment a few hours after the commission of the crime he not only admitted the ownership of the car, but had the keys in his pocket.[26] Such possession of the keys instantly raised an inference that his telephoned report of the theft of the car was nothing but an attempt to create an alibi for himself. That inference was additional evidence of guilt. It follows that there is clearly sufficient evidence to support Robinson's conviction.

However, we cannot say, as a matter of law or fact, that the jury accepted the prosecution's testimony regarding the voluntary character of Robinson's confession, or that it rejected Robinson's claim of coercion. If the jury determined that the confession was coerced, then it may have convicted Robinson on the theory that the improperly admitted confession of Hickman was corroborated by the independent evidence which placed Robinson at the scene of the crime. Or, it may have reacted to the improper instructions noted above, and convicted Robinson on Hickman's confession standing alone, on the theory that the latter was not an accomplice whose testimony required corroboration. It may even have been confused by the improper instructions on conspiracy, and convicted on the theory that the conspirators' extrajudicial statements were binding on Robinson. Conviction on

[26]Robinson's admission of ownership, made immediately before his arrest, was not a portion of the subsequent confession which he claims to have been coerced. On the other hand, his admission that the murder weapon was his grandfather's shotgun was a portion of the subsequent confession, and not to be considered unless the latter was voluntary.

any one of the three theories last mentioned would have been improper.

When, as in this instance, a reviewing court is unable to determine from the record whether a jury convicted on admissible evidence or rejected that evidence and convicted on inadmissible evidence improperly received, it must find the error to have been prejudicial. Under a different factual situation, but where the principle was equally applicable, this court said: "However reprehensible the conduct of an accused, he is entitled to have its legal consequences determined from competent evidence by a jury properly instructed. Here, we cannot fairly say that, had the improper evidence improperly used not been before the jury, unadvised of its impropriety, the verdict and sentence would have been the same." (*People* v. *Orcalles*, 32 Cal.2d 562, at p. 573 [197 P.2d 26].)

When, as here, reliance on the improperly received evidence was aided by improper instructions, there should be no question of the prejudicial nature of the dual error (*People* v. *McCaughan*, 49 Cal.2d 409, 416 [317 P.2d 974], and cases cited therein). In civil appeals it has been the invariable rule that reversal is required when it is impossible to determine whether the verdict was based on admissible evidence submitted under correct instructions, or on erroneous determination of questions improperly submitted to the jury. (*Miller* v. *Peters*, 37 Cal.2d 89, 95 [230 P.2d 803]; *Clement* v. *State Reclamation Board*, 35 Cal.2d 628, 644 [226 P.2d 897]; *Edwards* v. *Freeman*, 34 Cal.2d 589, 594 [212 P.2d 883]; *Huebotter* v. *Follett*, 27 Cal.2d 765, 770-771 [167 P.2d 193]; *Oettinger* v. *Stewart*, 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221].) It is equally (if not more) important to grant the same benefit of the doubt to a defendant on trial for his life.

Viewed without reference to the foregoing concept, the evidence of guilt here appears to be strong. But that very thought is, in itself, a warning of danger. Why do we consider the evidence of guilt to be overwhelming? In all probability it is because we are aware that the four statements of the various defendants, each made independently of the other, dovetail completely. Taking them together, and considering the circumstances under which each was made, there seems to be no likelihood that any one of the four defendants was innocent of the crime with which he was charged. But, we are not entitled to determine either of these appeals on the basis

of evidence which we have already held to have been inadmissible as against these appellants. Similarly, the jury was not entitled to convict on the basis of any such evidence. Before we can affirm the verdict against Robinson on the basis that the trial court's error was not prejudicial, we must find that there was no reasonable probability that the jury would not have convicted in the absence of that error. But we cannot make that statement without recourse to testimony which was not admitted as against Robinson. If this court has difficulty in separating the admissible evidence from the inadmissible, it cannot assume that a jury of laymen did not have the same difficulty. It follows that the error in admitting Hickman's cross-examination and the various errors in the instructions must be deemed to have been prejudicial.

The judgments of conviction as to Robinson and Drivers are reversed, and the cause, as to them, remanded for a new trial.

Gibson, C. J., Traynor, J., Tobriner, J., and Peek, J., concurred.

SCHAUER, J.—I dissent from the reversals of the judgments of conviction as to both Robinson and Drivers. In my view all but one of the asserted errors found by the majority are not errors at all; and that one (which at most is questionable)—i.e., failure of the trial court to instruct *on its own motion* that Hickman was an accomplice as a matter of law—is clearly not prejudicial (Cal. Const., art. VI, § 4½) when analyzed in the light of the record, including the instructions given.

### Asserted Error in Allowing Hickman to Make a Judicial Confession of the Crime

The majority hold (*ante*, pp. 392-394) that the trial court erred in allowing Hickman (a convicted coconspirator who has not appealed) to testify in detail as to the facts of the crime and thus make a full judicial confession. The opinion asserts that such confession was "elicited" by a cross-examination that "exceeded the scope" of the direct examination of Hickman, which dealt only with the initially claimed, but subsequently disproved, "involuntariness" of his extrajudicial confession. In my view neither the established facts nor the applicable law support this holding. A reading of the relevant portion of the transcript (see especially fn. 1, *post*) shows that the matter assertedly "elicited" or "obtained"

by the prosecutor was in fact volunteered by Hickman in the course of an indubitably proper cross-examination.

It is undisputed (see majority opinion, *ante*, p. 385, fn. 11a) that Hickman took the witness stand and testified on *direct examination* that his previous account (given on his request before the confession was received in evidence) of asserted events allegedly coercing his confession was true. The prosecuting attorney then cross-examined, and that inquiry began and progressed to the volunteer statement exactly as set forth in the margin.[1] It is apparent from this transcript that the italicized testimony—i.e., "and the statement I gave Sergeant Wrona is the truth"—was volunteered

---

[1] "CROSS EXAMINATION

"BY MR. COURTNEY [deputy district attorney]:

"Q. Well, Mr. Hickman, as I understand it then, all of the testimony which you gave here before in court you are again reiterating that all of those statements are true, is that right? A. [Hickman] Yes, sir, they are.

"Q. And you have been present in court and heard all the witnesses the People have called to testify as to many of those same events, is that right? A. Yes, sir.

"Q. And you have heard the officers from the County Jail come in here this morning and testify that they were the deck officers on the Deck 11-B-1 where you were located and they do not recall any complaints; you heard that testimony? A. Yes, sir.

"Q. Is it still then your testimony that at least three times a day for the period of at least the week between February 7th and 14th that you registered complaints with the Deck Officers? A. Yes.

"Q. And this is your testimony, that you were beaten, as you have told us before, in the Detective Headquarters of Homicide down in the Sheriff's Department, is that right? A. Yes, sir.

"Q. And that was by the Captain Etzel? A. Yes.

"Q. And you further testified that you were beaten again in the building where the polygraph is located? A. Yes.

"Q. By Officer Wrona and Officer Human? A. Yes, sir.

"Q. And all of that was the truth? A. Yes, sir, *and the statement I gave Sergeant Wrona is the truth.*" (Italics added.)

The "statement" that Hickman had given to Sergeant Wrona was his extrajudicial confession (summarized by the majority at pp. 380-382 *ante*) in which Hickman admitted, *inter alia*, the following facts establishing his guilt of the crime charged: that he and Robinson and Drivers had planned for several weeks to rob the Fox Hills Country Club; that on the evening of the crime he went to work at the club at the usual time, with the understanding that the other two would join him there at the closing hour; that when Robinson and Drivers arrived (with Guliex) in the club's parking lot Hickman told them that it was not yet safe to carry out the robbery; and that Hickman subsequently returned to the parking lot and gave the signal, whereupon his coconspirators entered the club and proceeded with their prearranged plan for robbery which resulted in the murder of Grego.

by Hickman rather than being responsive to any question thereofore asked by the prosecutor.[2] It is true that a number of the prosecutor's inquiries thereafter were phrased in the form, technically, of leading questions. But on cross-examination this is not improper. There is no indication that Hickman at this time was in any way reluctant to tell the truth on the witness stand: not only did he first volunteer the subject testimony, but throughout the entire remainder of the cross-examination he made no objection or motion to strike, and declined to join in those made by his codefendants. We may reasonably infer that Hickman—as he had every right to do—chose this course of action in the hope of impressing the jury with his candor and asserted minimal participation in the actual shooting and thus warrant a sentence of life imprisonment rather than death.[3] Hickman's tactics proved justified, as in his case the lesser penalty was in fact assessed by the jury; and it is significant that Hickman, alone of those convicted, chose neither to move for a new trial nor to appeal.

The majority's extended discussion about hearsay in relation to Hickman's testimony appears to be devoid of materiality because no such issue is actually involved. As counsel at the trial apparently well knew, Hickman's judicial confession was not subject to hearsay objection at all. This, the majority ultimately acknowledge (*ante*, p. 393): "the factual testimony of any witness, given in open court, is not hear-

---

[2]The sole objection at this point was a motion to strike interposed *by Robinson* on the ground of nonresponsiveness of Hickman's answer; the motion was denied. As a general rule, of course, such a motion is made, if at all, by the party examining the witness, who is entitled to conduct his inquiry in the manner he deems most effective and may prefer to retain an unsolicited but competent answer. (*Holzer* v. *Read* (1932) 216 Cal. 119, 122 [3] [13 P.2d 697]; *Hirshfeld* v. *Dana* (1924) 193 Cal. 142, 147-149 [1] [223 P. 451], and cases there cited; but see Code Civ. Proc., § 2056.) And it is clear that "The fact that an answer is not responsive to a question does not render it inadmissible" (*Van Horn* v. *Southern Pac. Co.* (1956) 141 Cal.App.2d 528, 536 [7] [297 P.2d 479], quoting from *Westman* v. *Clifton's Brookdale, Inc.* (1948) 89 Cal. App.2d 307, 314 [6] [200 P.2d 814]; see also 3 Wigmore, Evidence (3d ed. 1940) § 785).

[3]As the majority point out (*ante*, p. 387, fn. 12), negating the possibility of a "deal" between Hickman and the prosecution were the facts that no motion was made to reduce the charge against Hickman to a lesser one than first degree murder, and that at the penalty phase the prosecutor urged the death penalty for all defendants including Hickman.

say." But the opinion nevertheless ascribes error to this portion of the trial: it holds that the subject cross-examination of Hickman "exceeded the scope" of his direct examination. As will next be shown that holding is untenable for at least three independently adequate reasons.

To begin with, the record discloses that the only objection made on the ground that the cross-examination of Hickman exceeded the scope of the direct was belatedly voiced by counsel for *Robinson*; no such objection was at any time made or joined in either by Hickman, who was the defendant actually being examined, or by Drivers, who now *benefits* from the asserted error. Robinson's objection came too late, in that Hickman had already testified without such objection that his extrajudicial statement was true and in particular that he and Robinson and Drivers had several times discussed robbing the Fox Hills Country Club about three weeks before the night of the crime. Moreover, no motion was made by any defendant to strike the latter testimony, which therefore remained in the record for the jury to consider with the defendants' acquiescence.

Secondly, even if a timely objection had been made by the proper party it would not have warranted restricting the prosecutor's right of cross-examination in the circumstances here shown and under existing law. It has been held in varying contexts that if a defendant in a criminal case volunteers a statement on cross-examination he may be further examined thereon by the prosecuting attorney (or judge), even though the statement concerns matters which were not embraced in his direct examination. (*People* v. *Peete* (1946) 28 Cal.2d 306, 321 [10] [169 P.2d 924]; *People* v. *Sutton* (1887) 73 Cal. 243, 244-245 [15 P. 86]; *People* v. *Shields* (1945) 70 Cal.App.2d 628, 638 [7] [161 P.2d 475]; *People* v. *Fitch* (1938) 28 Cal.App.2d 31, 44 [6] [81 P.2d 1019].) Applying that rule to the case at bench, the subject cross-examination would thus have been proper even if it had technically "exceeded the scope" of Hickman's direct examination.

Thirdly, it does not appear that the latter's scope was "exceeded" in any event. The majority acknowledge (*ante*, p. 392) that "it was a proper subject of cross-examination" to ask Hickman whether "the facts stated [in his extrajudicial confession] were true," on the theory that "the truth or falsity of the statement is a fact from which the jury might infer that it was voluntary." But the majority then assert (*ante*, p. 393) that "the truth or falsity of any fact,

without relation to the extrajudicial statement, bore no relationship to the matter developed on direct." That point would be relevant only if during the subject cross-examination some *new* fact had appeared; but again the record is otherwise, and discloses that no substantial incriminating fact was "elicited" or "obtained" in this cross-examination that had not already been brought out in the admittedly proper reading of Hickman's extrajudicial confession to the jury. It follows under the majority's analysis that the prosecutor would have remained within the bounds of "a proper subject of cross-examination" if only he had prefaced each factual inquiry with the phrase, "Is it true that, *as you said in your prior statement* given to Officer Wrona on February 4, 1962, and heretofore read to the jury, .. ?" It would be a time-wasting exercise to require the prosecutor to repeatedly utter such a ritualistic formula. He was properly seeking to verify the portions of truth, if any, in Hickman's extrajudicial statement; what more logical and effective way to do so than to ask Hickman if each of the confessed events actually occurred? There can be no doubt that the court and the jury understood the prosecutor's purpose and the significance of his questions.

Hickman's answers, of course, constituted a judicial confession implicating each of his codefendants, but the latter have no ground to complain of its admission in evidence against them. As noted above (and as the majority acknowledge), such a confession is not hearsay; rather, "it is direct evidence competent for the proof of all elements of the crime" (*People* v. *Ditson* (1962) 57 Cal.2d 415, 445 [18] [20 Cal.Rptr. 165, 369 P.2d 714].) It was volunteered by Hickman for reasons best known to himself;[4] and if in so doing he also dealt a blow to his codefendants' chances of acquittal, such is a risk that must be run by those who conspire together to break the law. It is, after all, far from rare that one of a band of arrested conspirators decides to unburden his guilt at the bar of justice, and his partners in crime must be prepared to face that eventuality.

*Asserted Insufficiency of the Evidence Against Drivers*

The majority further hold (*ante,* pp. 397, 404) that there was insufficient evidence to corroborate Hickman's judicial

---

[4]As observed hereinabove, it well may be that this act helped gain for Hickman the lesser penalty than that accorded his codefendant Robinson.

confession insofar as it implicated Drivers in the commission of the crime. In reaching that conclusion, however, the majority rely on what we have heretofore held to be an erroneous and obsolete theory of the function of an appellate court in reviewing the issue of sufficiency of corroborative evidence. When the evidence here presented is viewed under currently accepted principles of law, it is seen to be abundantly sufficient for the purpose of corroboration of an accomplice.

Penal Code section 1111 declares in relevant part that "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall *tend to* connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (Italics added.) Construing this requirement we have consistently held—as summarized by Mr. Justice Peters in *People* v. *Howk* (1961) 56 Cal.2d 687, 704 [10] [16 Cal.Rptr. 370, 365 P.2d 426], quoting from *People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1, 2] [1 Cal.Rptr. 683, 348 P.2d 116]—that "The only corroboration necessary [for compliance with the statute] is that which *tends to* connect the defendant with the commission of the crime, not evidence of the corpus delicti. [Citing cases.] The corroborative evidence may be *slight and entitled to little consideration when standing alone.* [Citing case.] Defendant's own admissions are sufficient corroboration. [Citing case.] Finally, corroborative evidence *may be circumstantial.* [Citing case.]" (Italics added.) (Accord, *People* v. *Santo* (1954) 43 Cal.2d 319, 327 [5, 6] [273 P.2d 249], and cases there cited.)

In this connection the majority discuss the evidence of Drivers' fingerprints which were found on both sides of the right-hand front (passenger) door of the intended getaway car. It will be remembered that this car, a 1950 Ford purchased by defendant Robinson only a day or so before the commission of the crime, was abandoned with its gears jammed in the parking lot of the Fox Hills Country Club, facing the exit, and with its rear license plate obscured by means of a white rag. Although the fingerprint expert could not fix "an exact time" when Drivers' prints were placed on the car, he also testified that one such print was found on the outside surface of the door glass and that prints disappear soon when exposed to the elements in that manner. The majority summarized (*ante,* p. 398) by saying that this evi-

dence "showed no more than that Drivers had been present in or about the Ford on some recent date." But the majority then stress the fact that both Drivers, who is Hickman's cousin, and Campbell, the original owner of the Ford, had been frequent visitors to Hickman's apartment. On the basis of that fact the majority proceed to deny any corroborative value to the evidence of Drivers' fingerprints, theorizing that such prints "are as *equally susceptible to an inference that they came there innocently*, as they are to any inference that their presence connects defendant with the commission of the crime." (Italics added.) (*Ante*, p. 398.) Again, the majority refer to Drivers' story to the police wherein he claimed that early in the evening of the crime he and Robinson had driven in the Ford to take one of Hickman's children to visit a friend; and the majority conclude (*ante*, p. 399) that the "important feature" of this explanation is that it "shows that Drivers' fingerprints could have been placed on the Ford in a manner entirely unconnected with the crime."[5]

It is true that in such relatively early cases as *People* v. *Robbins* (1915) 171 Cal. 466, 470 [154 P. 317], relied on by the majority, support may be found for their theory that corroborative evidence is insufficient as a matter of law when, in the opinion of the *reviewing* court, it is "equally susceptible to an inference" of the defendant's innocence. But in *People* v. *Henderson* (1949) 34 Cal.2d 340 [209 P.2d 785], this court recognized that such a theory is in conflict with the proper function and limits of appellate review as set forth in the leading case of *People* v. *Newland* (1940) 15 Cal.2d 678, 681 [1]-684 [2] [104 P.2d 778]. Thus we stated in *Henderson* (at pp. 346-347 [6] of 34 Cal.2d) that "When as in the present record it is discovered that there is testimony aside from that of the accomplice which tends to connect the de-

[5]Again, in rejecting the People's argument that corroboration of Drivers' presence at the shooting may also be inferred from the fact that three persons were admittedly present at that time and that Robinson and Guliex escaped together, the majority say (*ante*, p. 404, fn. 25) that "The facts here argued by the prosecution are *equally susceptible to a theory* that Hickman was at the shooting, picked up the shotgun, went immediately to the cemetery where he discarded the gun, mask and other paraphernalia, and then returned to the club to telephone the police." (Italics added.) But the weight or effect to be given this evidence, in combination with all the other circumstances, would seem implicitly to be the proper function of the trier of fact—and of the trial judge—rather than of a reviewing court.

fendant with the commission of the crime, the function of the appellate court is performed. Questions of the weight of the evidence and the credibility of the witnesses are for the trial court, and since the circumstances reasonably justify the finding of guilt, *an opposing view that they also may be reconciled with innocence will not warrant interference with the judgment on appeal. (People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], and cases cited.)'' (Italics added.) Other decisions continue to reflect a similar view (see, e.g., *People* v. *Malone* (1947) 82 Cal.App.2d 54, 60 [2-3] [185 P.2d 870], and *People* v. *Allen* (1951) 104 Cal.App. 2d 402, 412 [5] [231 P.2d 896]), and in *People* v. *Gallardo* (1953) 41 Cal.2d 57, 63, unnumbered fn. [257 P.2d 29], we recognize and articulate the change in the law as follows: ''Although it has been said that corroboration is not sufficient where the circumstances are consistent with the innocence of the accused (see, e.g., *People* v. *Davis,* 210 Cal. 540, 555 [293 P. 32]; *People* v. *Kempley,* 205 Cal. 441, 461 [271 P. 478]; *People* v. *Robbins,* 171 Cal. 466, 470 [154 P. 317]), the more recent decisions have held that whether the corroborating evidence is as compatible with innocence as it is with guilt is a question of weight for the trier of fact (see *People* v. *Henderson,* 34 Cal.2d 340, 347 [209 P.2d 785]; *People* v. *Estes,* 99 Cal.App.2d 745, 747 [222 P.2d 454]; cf. *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]).''[6] It thus appears that the majority opinion seeks to resurrect an outmoded theory of appellate review whose passing was expressly observed by this court over a decade ago.

Moreover, the majority reject the fingerprint evidence as showing only ''association with the criminal,'' not with the crime itself (citing *People* v. *Reingold* (1948) 87 Cal.App.2d 382, 399-400 [6] [197 P.2d 175], and *People* v. *Braun* (1939) 31 Cal.App.2d 593, 601-602 [3] [88 P.2d 728]). But this court has held that ''The relationship of the men [i.e., the defendant and his accomplice] and all of their acts and conduct may be considered in determining whether there are

---

[6]In accord with the latter proposition are such cases as *People* v. *Farrell* (1955) 133 Cal.App.2d 427, 431 [5] [284 P.2d 29]; *People* v. *Wales* (1955) 136 Cal.App.2d 846, 852-853 [3] [289 P.2d 305]; *People* v. *Goldstein* (1955) 136 Cal.App.2d 778, 789 [5c] [289 P.2d 581]; and in *People* v. *Lyons* (1958) 50 Cal.2d 245, 259 [6] [324 P.2d 556], this court reiterated the just quoted language from *Henderson* (at pp. 346-347 [6] of 34 Cal.2d), adding that ''Regardless of how we might think we would resolve the conflicts if we were initially trying the issues of fact, our duty in the appellate function is clear.''

corroborating circumstances.'' (*People* v. *Henderson* (1949) *supra,* 34 Cal.2d 340, 343 [4].) In the latter case we held that within the evidence that ''shows corroboration'' was the following: ''It was established by the testimony of the accomplice's sister and by the two women companions that Roberts [the accomplice witness] and the defendant were together most of the day preceding the attempted robbery and that they were together in the defendant's car when the women were taken to their homes which was about three hours before the crime was committed.'' (*Id.* at pp. 345-346 [5] of 34 Cal.2d.) Likewise, in the case at bench, Drivers' own admissions to the police placed him in company with Robinson in the Ford in the late afternoon and early evening of the night of the crime, only a few hours before the murder was committed; and the evidence of Drivers' recent fingerprints inside and outside that same vehicle was unquestionably relevant to establishing the kind of ''relationship'' referred to in *Henderson.* It is true that here, just as in *Henderson,* the mere association of Drivers and Robinson shortly before the crime is not in and of itself sufficient corroboration; but ''such association when considered in conjunction with other corroborating circumstances has been held to be a factor tending to connect an accused with the commission of the offense.'' (*People* v. *Moore* (1963) 211 Cal.App.2d 585, 594 [8] [27 Cal.Rptr. 526], citing *People* v. *Henderson* (1949) *supra; People* v. *Hoyt* (1942) 20 Cal.2d 306, 310-311 [125 P.2d 29]; and *People* v. *Willmurth* (1947) 77 Cal.App.2d 605, 611-612 [1] [176 P.2d 102]; accord, *People* v. *Wayne* (1953) 41 Cal.2d 814, 822 [2b] [264 P.2d 547]; *People* v. *Frankfort* (1952) 114 Cal.App.2d 680, 692 [17] [251 P.2d 401]; *People* v. *Dodd* (1952) 113 Cal.App.2d 682, 686 [1, 2] [248 P.2d 965]; *People* v. *Ross* (1941) 46 Cal.App.2d 385, 395 [3] [116 P.2d 81], and cases there cited.)

The latter proposition, of course, is simply an illustration of the broader principle that the prosecution is not required to single out an isolated act or word which in and of itself is offered as sufficient corroboration of the accomplice's testimony; rather, the prosecution may rely for this purpose on the combined and cumulative effect of all the relevant nonaccomplice evidence and the inferences that the jury may reasonably have drawn therefrom. The majority purport to recognize this principle in asserting (*ante,* p. 398) that none of the items of evidence discussed, ''independently or cumulatively, constituted the requisite corroboration.'' But the

majority then go on to consider and evaluate each item "independently"; nowhere are the corroborative facts actually considered "cumulatively," nowhere do the majority see the whole picture that was put before the jury.

For example, the majority view the evidence of Drivers' conflicting statements to the police entirely out of context. The majority say (*ante*, p. 400) that the witness, Officer Wrona, "was able to point to but one conflict in the repetition of a narrative covering Drivers' movements for three days (i.e., the place in which he slept during the early morning hours of February 4th)." But this seemingly innocuous discrepancy takes on a far different light when it is remembered that it was precisely during those same "early morning hours of February 4th" that this murder was committed. The inconsistency in the suspect's explanations of his whereabouts during *that* period was obviously of the utmost importance. As that inconsistency could not reasonably be reconciled with total innocence, the majority are compelled to concede (*ante*, p. 400) that "At best, it tends to prove that Drivers, while talking to the police, *had a guilty frame of mind.*" (Italics added.) But again attempting to find this evidence "equally susceptible to an inference" that Drivers was innocent of *this* crime, the majority ask: "But in regard to what? It may be reasonable to assume that he had in mind some activity which he desired to hide from the police. But, there is no reasonable inference that his conflicting replies were made for the purpose of hiding connection with the crime with which he is now charged." (*Ante*, pp. 400-401.)

To so hold is to refuse to face the facts of this case. It will be remembered that when first asked (on the way to the police station) where he had spent the night of February 3-4, 1962, Drivers told the police he had spent it at his aunt's house. Once at the police station, however, Drivers changed his story and said he was in a dance hall from 10:30 p.m. that evening to 2 a.m. the next morning, but that he saw no one there he knew; that he then "had a hamburger" and went to Hickman's apartment at 3:30 or 4 a.m., noticed that it had been searched, and spent the remainder of the night there. It is well settled that "False and contradictory statements of a defendant in relation to the charge are themselves corroborative evidence." (*People* v. *Santo* (1954) *supra*, 43 Cal.2d 319, 327 [8]; accord, *People* v. *Simpson* (1954) 43 Cal.2d 553, 564 [6] [275 P.2d 31]; *People* v. *Hannie* (1962) 202 Cal.App.2d 462, 465 [2] [20 Cal.Rptr. 808]; *People* v. *Dykes* (1961) 198 Cal.App.2d 75, 80 [2b] [17 Cal.Rptr. 564];

*People* v. *Neely* (1958) 163 Cal.App.2d 289, 301 [3] [329 P.2d 357] ; cf. *People* v. *Osslo* (1958) 50 Cal.2d 75, 93 [4] [323 P.2d 397], and cases there cited.) The majority's attempt to distinguish *Santo* is ineffectual, for it is obvious that in this area of the law each case must turn on its own facts. What is important is the rule of law illustrated by such decisions, and here the jury were properly instructed in that regard.

Moreover, the jury were entitled to consider more than the bare contradiction *between* Drivers' stories; they could also consider the *contents* of either or both of such explanations. In particular, the jury could weigh the significance of Drivers' claim that at 10:30 p.m. on February 3 he went to a public dance hall and remained there until 2 a.m. on February 4. Such an alibi would neatly account for his whereabouts during the crucial period of time relating to the murder (which was committed shortly after 1 a.m. on February 4), yet would have been virtually impossible to verify because the asserted locale was a public dance hall and Drivers claimed he knew no one there.

The jury could also consider the significance of Drivers' movements thereafter. In spite of the lateness of the hour he did not return home but (according to his second story to the police) went to Hickman's apartment at about 3:30 or 4 a.m. that night. The jury could reasonably infer that the purpose of Drivers' nocturnal visit was not an innocent social call, but to learn whether Robinson and Hickman had successfully escaped after their getaway car had stalled while leaving the scene of the crime. Upon reaching Hickman's apartment, however, Drivers observed that the police had arrived before him and were still on the premises; but rather than entering to see if he could be of any assistance to his cousin, Drivers remained outside until the police departed. He then went into the apartment and found that it had been searched and Hickman was not there; nevertheless Drivers remained in the empty apartment until morning. When no one returned (Robinson and Hickman had already been arrested, but Drivers did not yet know this) he left and spent the day at his uncle's house. At 10 p.m. Drivers took a bus to downtown Los Angeles, and slept that night in an all-night movie theater. *The majority assert (ante, p. 401) that there was no evidence of flight on Drivers' part, but fail to mention any of the foregoing facts.* While Drivers' evasion and flight may not

have been as prolonged[7] as was shown of the defendants in *People* v. *Santo* (1954) *supra*, still the jury could reasonably infer that such was his original intent as manifested by the above described movements. The question was one for the jury to determine (Pen. Code, § 1127c; *People* v. *Santo* (1954) *supra*, 43 Cal.2d 319, 330 [13-14]), and they were properly so instructed.

In summary, the picture presented to the jury was as follows: Drivers' contradictory stories to the police concerned his whereabouts not just on any night, but during the precise period of the murder of Grego at the Fox Hills Country Club on February 4, 1962. Drivers' fingerprints were found not just in a car of "a relative," but in the particular car used by that relative and his accomplices as an attempted getaway vehicle after the commission of that same murder. And Drivers' evasive movements thereafter covered not just any sequence of time but the days and nights immediately following, again, the murder of Grego in the early morning hours of February 4. It is stretching the long arm of coincidence to the breaking point to require the jury as a matter of law—as the majority do—to find no corroboration of Hickman's testimony in the cumulative effect of the foregoing sequence of events.

### Asserted Error in Accomplice Instructions

The majority hold (*ante*, pp. 394-396) that the trial court prejudicially erred in instructing that whether or not any witness in the case was an accomplice was for the jury to determine, and in failing to give on its own motion an instruction that Hickman was an accomplice as a matter of law. But even if we assume error was so committed, consideration of the other instructions given on this subject shows that it could not reasonably have been prejudicial. The majority predicate prejudice on the ground (*ante*, p. 396) that this claimed error "denied the codefendants the protection intended by Penal Code section 1111." But here the court actually gave better protection to the coconspirators than would have been provided by instructing that Hickman was an accomplice as a matter of law: the court went right to the point and specifically told the jury that "In weighing the testimony of defendant WILLIE WARNER HICKMAN as against his codefendants you ought to view it with distrust."

---

[7]Drivers surrendered to the police on February 6, 1962, after he had been informed by his parole officer that the police were looking for him.

Obviously the real protection afforded by Penal Code section 1111 is *not* the right to an instruction that on the facts shown a certain witness is an accomplice as a matter of law; that instruction is at most preliminary to the true protection provided by that section—i.e., the right to be free from a conviction had "upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. ..." The latter right was fully accorded to Hickman's codefendants, for complete instructions were given in the language of section 1111 and in the language of our prior decisions explaining the jury's duties with respect thereto.[8]

The majority also assert (*ante*, p. 395) that the trial court "should not have invited the jury to speculate" on who was an accomplice. But when, as here, the jury are otherwise properly instructed[9] and the facts establishing complicity are so clear that an appellate court can hold (as do the majority here) that the witness is an accomplice *as a matter of law*, we must presume that the jury obediently applied the instructions to those facts and found Hickman to be an accomplice. To do otherwise would be to presume that the jury violated

---

[8] "A conviction may not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. ...

"Corroborative evidence is additional evidence to the same point and although it need not be sufficient standing alone to support a conviction, it must relate to some act or fact which is an element of the offense with which the defendant is charged. It must, in and of itself and independent of the evidence which it supports, fairly and logically tend to connect the defendant with the commission of the alleged offense. Corroborative evidence may consist of other evidence of circumstances, the testimony of a witness other than an accomplice or the testimony or admissions, if any, of the defendant.

"In determining whether an accomplice has been corroborated you must first assume the testimony of the accomplice to be removed from the case. You must then determine whether there is any remaining evidence which tends to connect the other defendants with the commission of the offense. If there is none you must acquit the other defendants. If there is such evidence then his testimony is corroborated. But before you may convict any defendant you must find from all the evidence that it carries the convincing force required by law."

[9] See fn. 8, *ante*. The majority comment (*ante*, p. 394, fn. 20) that the court "gave several different instructions on the definition of an accomplice, some correct and some subject to doubt," but decline to pass on their propriety. The record shows, however, that only two instructions defining accomplice were given, both correctly phrased in the language of the relevant statutes (Pen. Code, §§ 1111 and 31).

their duty.[10] Since the jury must have thus found Hickman to be an accomplice, and in any event were specifically instructed that ''You ought to view [Hickman's testimony] with distrust,'' it is not reasonably probable that a result more favorable to the defendant Drivers would have been reached in the absence of the declared error, and hence no prejudice appears. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [12] [299 P.2d 243].) The issue, moreover, is far from novel, and has been decided in the manner set forth above by at least two opinions of this court (*People* v. *Barclay* (1953) 40 Cal.2d 146, 152-153 [5] [252 P.2d 321], and *People* v. *Ferlin* (1928) 203 Cal. 587, 601-602 [10] [265 P. 230]) and a long line of cases in the District Courts of Appeal (see, e.g., *People* v. *Richardson* (1960) 182 Cal.App.2d 620, 623 [2, 3] [6 Cal.Rptr. 61]; *People* v. *Chapman* (1949) 93 Cal.App.2d 365, 383 [21]-384 [22] [209 P.2d 121]; *People* v. *Wahnish* (1937) 20 Cal. App.2d 58, 62-63 [1] [66 P.2d 677]; *People* v. *Bonner* (1935) 5 Cal.App.2d 314, 316-318 [3] [42 P.2d 694]; *People* v. *Rous* (1931) 118 Cal.App. 534, 537 [4] [5 P.2d 470]; *People* v. *Knoth* (1931) 111 Cal.App. 250, 253-254 [3] [295 P. 577]; cf. *People* v. *MacKenzie* (1956) 144 Cal.App.2d 100, 108-109 [300 P.2d 700]; but see *People* v. *Dailey* (1960) 179 Cal. App.2d 482, 485 [3]-486 [5] [3 Cal.Rptr. 852].)

The above mentioned specific accomplice instruction (''In weighing the testimony of . . . Hickman as against his codefendants *you ought to view it with distrust*'' (italics added)) was, of course, obedient to the command of Code of Civil Procedure section 2061, which declares that the jury ''are . . . to be instructed by the court on all proper occasions: . . . 4. That the testimony of an accomplice ought to be viewed with distrust, . . .'' It bears emphasis that here the court did not qualify the latter instruction by telling the jury that it was applicable *only if* they found Hickman to be

[10]The majority speculate that the jury's inability to reach a verdict against Guliex means that at least some jurors ''must have ... determined that Guliex was not an accomplice.'' (*Ante*, p. 395.) But there is a vast difference between (1) the *possibility* in any given case that the jurors may not have followed an instruction, and (2) a *presumption* by an appellate court that such violation of the jurors' duty took place. Human nature being what it is, we can rarely if ever know in an appellate proceeding why a jury of twelve men and women may fail to reach (as to each and all of several defendants) unanimity in their deliberations. And no speculation as to what some members of that group of jurors ''must have determined'' as to one defendant will rise to the level of proof of what the whole jury in fact determined as to another defendant.

an accomplice; rather, the jury were affirmatively instructed that in weighing Hickman's testimony as against his codefendants "you ought to view it with distrust." The court thereby indicated its opinion that Hickman was an accomplice as a matter of law; and in any event, the giving of this instruction on the court's own motion afforded better than the measure of protection to Hickman's codefendants that would have been provided by instructing that as a matter of law Hickman "was an accomplice."

### Asserted Error in Giving Conspiracy Instructions

The majority hold (*ante*, pp. 396-397) that the trial court committed prejudicial error in instructing on the law of conspiracy. This—to me—on any view of the record, is an erroneous and confusing holding. I think we would not permit it to stand in a District Court of Appeal published opinion. It is not contended that any such instruction was an incorrect statement of law; rather, it is said first that "the question of conspiracy was not involved" and "conspiracy never did become an issue" in this case, and hence that the giving of conspiracy instructions "must have confused the jury" (citing *People* v. *Sanchez* (1947) 30 Cal.2d 560, 572 [7] [184 P.2d 673]). To the contrary, the issue of conspiracy was indisputably very much involved in the evidence put before the jury. Were the defendants accomplices? Did they by agreement cooperate in committing the crimes charged? Hickman's testimony on the witness stand constituted ample direct evidence of such a conspiracy: he testified that he and Robinson and Drivers had discussed robbing the Fox Hills Country Club three or four times "or more"; that among the matters discussed was the question of "what night it would be"; that on the day of the crime Hickman "told 'em [i.e., Robinson and Drivers] what time to come" to the country club; that when Hickman saw Guliex in the car waiting in the parking lot, "I figured that he would get his part" and that there would be a four-way split of the loot; that when the others first met Hickman at 11 p.m. he told them in substance that "We can't hold the robbery right now because there's a lot of people inside," and that it was agreed that Hickman would return to tell the others when "The coast is clear"; thereafter the robbery was attempted on Hickman's signal, culminating in the wounding of Morrissey and the murder of Grego.

It cannot be seriously argued that the foregoing testimony did not constitute sufficient evidence upon which the jury

could base a finding that Hickman, Robinson, and Drivers conspired to rob the Fox Hills Country Club on the night of February 3-4, 1962. Indeed, the majority appear to indirectly acknowledge this fact by referring to Robinson's refraining from naming "his coconspirators" (*ante*, p. 380, fn. 3) and to Guliex's having placed himself "in the conspiracy" (*ante*, p. 395). There being such evidence of conspiracy in the record, it was not error to instruct the jury on the law of conspiracy. It is immaterial that (as the majority emphasize) no separate crime of conspiracy was charged in the information and the prosecution did not amend its pleading in this regard. The state is not required to charge every crime which the defendants may have committed. (See *People* v. *Pike* (1962) 58 Cal.2d 70, 88 [15] [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Ditson* (1962) *supra*, 57 Cal.2d 415, 447 [22]; *People* v. *Davis* (1957) 48 Cal.2d 241, 250 [11] [309 P.2d 1]; *People* v. *Tanner* (1935) 3 Cal.2d 279, 299 [7] [44 P.2d 324]; *People* v. *Wells* (1960) 187 Cal.App.2d 324, 329-330 [12] [9 Cal.Rptr. 384].)

The majority concede, as they must, the latter long-established principle, but point to the fact that the conspiracy instruction contained no admonition that a defendant may not be found to be a coconspirator on the uncorroborated testimony of an accomplice; from this premise the majority conclude (*ante*, p. 397) that the conspiracy instructions as given were "highly prejudicial" because "they constituted an invitation to the jury to find that Robinson and Drivers were members of a conspiracy, predicated solely on the uncorroborated testimony of Hickman, and so guilty of the charge of murder." But under the authorities cited hereinabove, we must presume that the jury followed the accomplice instructions given, and found (on evidence so clear that the majority hold Hickman to be an accomplice as a matter of law) that Hickman was in fact an accomplice; it follows that without violating their duty the jury could not have found Robinson and Drivers to be coconspirators on Hickman's testimony *unless* the latter was also found to be corroborated. That corroboration, as shown in detail hereinabove, was amply provided by the totality of the evidence put before the jury other than Hickman's testimony.

*Asserted Grounds for Reversal of the Judgments*

For the foregoing reasons I am of the opinion that no prejudicial error was committed as to Drivers and that, con-

trary to the majority's conclusion of insufficiency (*ante,* p. 404), the evidence amply support this appellant's conviction

As to his coappellant, the majority—although they reverse his conviction—admit that "there is clearly sufficient evidence to support Robinson's conviction." (*Ante,* p. 405.) Such evidence is found in Robinson's extrajudicial confession, in the fact that "the undisputed evidence placed him at the scene of the crime," and in the inference that "his telephoned report of the theft of the car was nothing but an attempt to create an alibi for himself." (*Ante,* p. 405.)

Moreover, the foregoing evidence of Robinson's guilt was unaffected by any of the errors discussed in the first part of the majority opinion. Yet the majority still conceive and project a theoretical basis for reversing the judgment as to Robinson as well. The majority note (*ante,* p. 405) that Robinson's extrajudicial confession was properly admitted by the trial court, "subject to its instructions that the jury must first determine that it was voluntary before it could consider it as binding upon Robinson." The majority then make this remarkable statement: "However, *we cannot say,* as a matter of law or fact, that the jury accepted the prosecution's testimony regarding the voluntary character of Robinson's confession, or that it rejected Robinson's claim of coercion." (Italics added.) (*Ante,* p. 405.) The statement is the more remarkable because earlier in the opinion (*ante,* p. 391, fn. 19) the majority brush aside the same issue of coercion with the following analysis of the relevant facts: "*There is no substantial evidence of coercion.* Not only was Robinson's testimony in this regard unconvincing, and thoroughly rebutted, but *the admitted circumstances militate against any inference of coercion. ...*" (Italics added.) No citation of authorities is needed to demonstrate that if there is "no substantial evidence of coercion," then we not only *can* say that the jury must have "rejected Robinson's claim of coercion"—we *must* say it, if we are to retain integrity in the judicial process; i.e., to remain guided by settled principles of law. To do otherwise is in effect to presume in favor of reversal that the jury violated their sworn duty to be governed (as they were instructed) "solely by the evidence introduced in this trial and the law as stated to you by the Court," for it presumes that the jury would illegally reach a finding of coercion when "There is no substantial evidence" of that asserted fact.

This patently incongruous conjecture progenerates the fundamental error of the remainder of the opinion. The ma-

jority speculate (*ante*, p. 405) that "If the jury determined that the confession was coerced" they "may have" convicted Robinson on any of the three other theories (i.e., that Hickman's judicial confession was improperly admitted; that the accomplice instructions were prejudically erroneous; or that conspiracy instructions should not have been given), and conclude that "Conviction on any one of the three theories last mentioned would have been improper." Thus the majority (1) reject the only inference that the jury could legally have drawn—under the majority's own analysis of the facts—from the evidence relating to the voluntariness of Robinson's confession, and then (2) search the record for some assertedly erroneous theory upon which the jury conceivably "may have" convicted the defendant, holding that conviction on such a speculated theory "would have been" improper. I cannot reconcile the majority's apparently labored search for a ground of reversal with our constitutional duty as an appellate court of the State of California (Cal. Const., art. VI, § 4½). It is *not* our duty to search for error and presume prejudice in favor of reversal; it *is* our duty to assume, in the absence of a contrary showing, that the jury followed the court's instructions. (*People* v. *Gould* (1960) 54 Cal.2d 621, 627-628 [8-9] [7 Cal.Rptr. 273, 354 P.2d 865] ; *People* v. *Dabb* (1948) 32 Cal.2d 491, 499 [8] [197 P.2d 1].)

In conclusion, for whatever it may be worth to those who participated in the proceedings below, I am impelled to express the personal opinion that seldom, in my experience, does a reviewing court see a record as commendably free of error, and creditable to the participants in the trial process, as this one. The trial judge and all counsel for both the People and each defendant, as I view the day-to-day action through the lens of the reporter, appear to me to have conducted the trial—and themselves—with appreciation of high ethical standards as well as with fairness, ability and devotion to duty. Neither is there any credible showing of overreaching at the apprehension or investigative stages.

I would affirm the judgments of conviction as to both appellants.

McComb, J., concurred.

Respondent's petition for a rehearing was denied July 15, 1964. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.