Filed 12/6/24  P. v. McDaniel CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KENTON MICHAEL MCDANIEL,<br><br>    Defendant and Appellant. | F085937<br><br>(Super. Ct. No. BF173073C)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In 2022, a jury convicted appellant Kenton Michael McDaniel of second degree murder for the 2017 death of Hardeep Singh (Pen. Code, § 187;[1] count 1). The jury also convicted McDaniel of active participation in a criminal street gang (§ 186.22, subd. (a); count 6).[2]

The jury found not true that McDaniel personally discharged a firearm during Singh's murder. However, the jury found true that McDaniel was a principal in the murder, and at least one principal intentionally and personally discharged a firearm (§ 12022.53, subds. (d), (e)(1)). For the murder, the jury found true a gang enhancement (§ 186.22, subd. (b)(1)). In count 6 (active gang participation), the jury found not true that McDaniel used a firearm (§ 12022.5, subd. (a)).

For the murder, McDaniel was sentenced to prison for 15 years to life, which was enhanced by 25 years to life for the firearm. The trial court imposed an upper term in count 6, which was stayed.

McDaniel was tried with his codefendant, Tymere Anthony Ross.[3] A witness, Tinamarie Hawthorne, was key to the prosecution's case against Ross and McDaniel. Hawthorne was with Ross and McDaniel on the night Singh was murdered. She testified pursuant to a plea agreement.

McDaniel asserts that his murder conviction must be reversed. He contends that Hawthorne was an accomplice as a matter of law, and her testimony was not

---

[1]     All future statutory references are to the Penal Code unless otherwise noted.

[2]     In count 1, the jury acquitted McDaniel of first degree murder. In count 2, the jury acquitted McDaniel of conspiring to commit a crime (§ 211; § 182, subd. (a)(1)). In count 3, the jury acquitted McDaniel of conspiring to commit a crime (§ 460, subd. (a); § 182, subd. (a)(1)). In count 4, the jury acquitted McDaniel of attempted robbery (§§ 664, 211). In count 5, the jury acquitted McDaniel of attempted burglary (§§ 664, 460, subd. (a)).

[3]     In companion appeal number F085822, we resolve issues which Ross raises.

2.

corroborated.  We reject this claim.  However, regarding McDaniel's other claim, the parties agree, as do we, that insufficient evidence supports the jury's true findings for the gang and firearm enhancements for the murder conviction.  We will reverse those true findings in count 1 and remand for resentencing.  We otherwise affirm.

## BACKGROUND

Neither Ross nor McDaniel testified at trial.  We summarize the material trial facts that support McDaniel's judgment.  We provide additional details later in this opinion when relevant to the specific issues raised.

### I. Singh's Murder.

On November 24, 2017, Hardeep Singh was fatally shot with a .45-caliber gun.  The bullet entered his face and exited the back of his head.  The shooting occurred at Singh's apartment complex in Bakersfield, California.  Singh was shot while he was standing outside.[4]  This shooting was reported to authorities at around 11:25 p.m.  When officials turned over Singh's body, they discovered a kitchen knife lying under him.

Just before the shot occurred, one witness heard a possible argument between Singh and another man.  After the shot was fired, two witnesses saw a single black male running away.  That suspect entered a vehicle, which sped off.  One witness saw the suspect get into the front passenger seat.

Law enforcement eventually identified and arrested four suspects: (1) Hawthorne; (2) Ross; (3) McDaniel; and (4) J.T., who was a minor when this murder occurred.  J.T. did not participate in this trial.

On the night Singh was killed, Hawthorne was working as a prostitute.  Earlier that evening, Singh contacted her for a date after she had posted an advertisement for her services.  Singh and Hawthorne had not previously met.

---

[4]     At the time of his death, Singh had morphine, methamphetamine, and alcohol in his blood system.

3.

Hawthorne drove to Singh's apartment complex with Ross, McDaniel and J.T. in her vehicle. She arrived at around 11:00 p.m. It took her about 10 minutes to find Singh. She parked her vehicle, and she went alone to meet Singh, who was waiting for her outside.

According to Hawthorne, Singh rejected her services because he did not "want a black girl." Hawthorne testified that Singh's rejection of her was not a big deal, and it was common in prostitution. She went back to her vehicle. At trial, she denied seeing Singh with a knife or other weapon.

According to Hawthorne, as she drove away, McDaniel told her to stop, saying he needed to use a restroom. First McDaniel and then J.T. exited her car. A short time later, Ross also exited her vehicle. Hawthorne heard a single shot. Hawthorne told the jury that Ross was not gone very long before the shot was fired, and he was the first to return to her vehicle. She said it took another 30 or 40 seconds before McDaniel and J.T. returned to her car. According to Hawthorne, McDaniel was holding a firearm when he got into the rear passenger seat.

Hawthorne testified that, after everyone got back into her vehicle, Ross and J.T. were screaming at McDaniel, asking, "[W]hy did you do that?" According to Hawthorne, McDaniel said he had to get out his aggression because his girlfriend had been assaulted, and he was mad.[5] McDaniel said that Singh "swung a knife at me."

Hawthorne told the jury that McDaniel pointed his gun at her and told her to drive away. At some point, J.T. commented that, if McDaniel was going to shoot, then McDaniel should have looked in Singh's pockets for money.

Law enforcement found a phone charger lying on the ground near Singh's body. McDaniel's deoxyribonucleic acid (DNA) was on that charger. The DNA on the charger

---

[5] According to a detective at trial, Hawthorne previously stated that McDaniel had "said something about his girlfriend had been kicked in the stomach by some East Siders, and he had to get some frustration out."

was a mixture from multiple sources. McDaniel's DNA was a minor contributor to that sample, while an unknown female was the major contributor. It is 120 billion times more likely that McDaniel contributed his DNA to this sample than a random person in the African American community.

## II.     The Motive for Singh's Murder is Unclear.

It does not appear that property was taken from Singh. He had an iPhone and $200 in his pocket. He was wearing jewelry. Nothing was disturbed in his apartment, which was nearby.

On the night in question, Ross, McDaniel and J.T. were active gang members with the West Side Crips. There was no evidence that Singh was a member of any gang. Singh's apartment complex was outside the normal territory of the West Side Crips.

The prosecution attempted to establish robbery or burglary as the motive for this crime. Earlier in 2017, Ross had accompanied Hawthorne on a prostitution date involving a different client. Ross had stolen cocaine from that other client, which he shared with Hawthorne.

It was the prosecution's theory that Ross accompanied Hawthorne on her date with Singh in order to rob Singh, or to burglarize his apartment. It was the prosecution's theory that Ross arranged for McDaniel and J.T. to accompany them for that purpose. According to the prosecution, Singh was killed during an attempted robbery or burglary.

At trial, Hawthorne testified that she was never aware of any plan that Singh would be robbed. She claimed that, when she picked up Ross to drive to her date with Singh, Ross had insisted that McDaniel and J.T. would also accompany them. She had initially refused, but she eventually relented. Hawthorne testified that, before that night, she had never met McDaniel.

Hawthorne believed that Ross, McDaniel, and J.T. were going to remain in her vehicle and smoke while she was with Singh for about one hour. However, she told the

jury that, as she drove to meet Singh, J.T. had asked her if he could "run through" Singh's apartment, and she had told him, "[H]ell, no." Hawthorne told the jury that she had understood J.T. to mean he wanted to go into Singh's residence and steal something. The jury learned that, during an interview with law enforcement, Hawthorne had claimed that J.T. had asked if all of them could run through Singh's apartment.

According to Hawthorne, both Ross and McDaniel came to her residence on a different day after this murder. McDaniel "threatened" her and told her that she "better not say nothing." She also told the jury that, after she was in custody for Singh's murder, she happened to see Ross on a jail bus. According to Hawthorne, Ross called her a snitch. He also said she had "better watch out" for her daughters.

The jury rejected the prosecution's theory regarding felony murder. The jury found both Ross and McDaniel not guilty of conspiracy, attempted robbery, or attempted burglary. The jury acquitted both Ross and McDaniel of first degree murder. However, the jury found both of them guilty of second degree murder.[6]

## III. The Concerns Regarding Hawthorne's Credibility.

During closing arguments, the prosecutor acknowledged that Hawthorne had credibility concerns. The prosecutor conceded that Hawthorne had lied. The prosecutor asked the jurors to scrutinize her testimony.

Hawthorne was initially charged with Singh's murder, and she faced a life sentence or possibly the death penalty. She testified against Ross and McDaniel pursuant to a plea agreement. In exchange for her truthful testimony, she agreed to be convicted as

---

[6]     We note that, with CALCRIM No. 522, the jury was instructed that provocation may reduce a murder from first degree to second degree. The jurors were informed that they were to decide the weight and significance of any provocation, and whether the crime was first or second degree murder. This record contains evidence that strongly suggests Singh was holding a knife when he was killed. According to Hawthorne, McDaniel said that Singh "swung a knife at me" after McDaniel was back in her vehicle.

an accessory after the fact (§ 32) with credit for time served. This plea agreement also resolved some outstanding misdemeanor charges in a different county.

Hawthorne was placed on witness relocation. She was receiving from the state about $1,700 a month for relocation expenses.

Hawthorne was about 31 years old when this murder occurred. She had worked as a prostitute since she was 18 years old. She admitted to the jurors that she had stolen items from some of her prior clients, such as watches and jewelry.

At the time Singh was killed, Ross was 19 years old.[7] Despite their age difference, Hawthorne claimed to the jury that she had a prior romantic relationship with Ross. Through Ross, Hawthorne had previously met J.T., whom she believed was Ross's cousin.

Hawthorne denied that Ross was her pimp.[8] However, she told the jury that Ross would occasionally go with her on calls with clients. She would give him a percentage of her earnings in exchange for his protection.

Law enforcement interviewed Hawthorne multiple times. Before she was arrested, Hawthorne lied to law enforcement, claiming she had no knowledge of Singh's death. After she was arrested, she eventually provided details about Singh's murder, culminating in her plea agreement. Hawthorne consistently denied any knowledge of a plan to rob Singh.

Hawthorne initially told law enforcement that only McDaniel exited her vehicle and confronted Singh. Law enforcement used a ruse and said witnesses had seen multiple suspects exit her vehicle. Hawthorne then claimed that both Ross and J.T. also exited her car. At one point during her statements to law enforcement, Hawthorne

---

[7]    When Singh was killed, McDaniel was 18 years old and J.T. was 17 years old.

[8]    The jury heard evidence that suggested Ross was earning money pimping other women.

7.

admitted that, when the three males exited her vehicle, she believed they were going to rob Singh.

**IV. The Jury did not Identify McDaniel as the Shooter.**

In November 2017, law enforcement was conducting a wiretap operation of certain members of the West Side Crips. This operation was initially unrelated to Singh's homicide.

Through this wiretap operation, law enforcement discovered that, on the day after Singh's murder, J.T. called a gang member asking for .45-caliber bullets. That same day, law enforcement stopped a vehicle in Bakersfield in which McDaniel and J.T. were both back passengers. A firearm was recovered from under the seat where J.T. had been sitting.

J.T.'s DNA was on this firearm. Testing later confirmed that this firearm had been used to kill Singh. Law enforcement discovered a video on social media that showed J.T. holding this same firearm several days before Singh's murder. Ross was with J.T. in that video.

Hawthorne told law enforcement that, on the night Singh was killed, McDaniel was holding a black gun. She also told the jury that McDaniel's gun was black. However, the gun used to shoot Singh was silver, or at least had a silver-colored slide.

At trial, Hawthorne said she believed McDaniel had been the shooter. According to Hawthorne, McDaniel was the only one holding a firearm when the three returned to her vehicle after she heard the shot. However, during her trial testimony, Hawthorne admitted that she never saw McDaniel shoot. She believed he was the shooter because he had held a gun, and the others had asked why he did that.

No surveillance cameras captured this shooting. Two eyewitnesses reported that the suspect who ran away was wearing a white shirt or sweatshirt. Video from social media showed Ross wearing a black shirt earlier that same day. Video from social media

showed J.T. wearing a black shirt on the night of the homicide. Video from social media showed McDaniel wearing a white shirt the day before this homicide.

One eyewitness said that the male suspect who ran away got into the front passenger seat of the vehicle that sped off. Hawthorne testified that it was Ross who was the front passenger. McDaniel and J.T. were the back passengers.

Some bushes were growing in the area where Singh was shot. At trial, the two eyewitnesses stated they only saw the single suspect. However, they both agreed it was possible other suspects may have been present.

One eyewitness said the fleeing suspect was shorter than Singh. In court, the two eyewitnesses could not identify either Ross or McDaniel as the male they saw running from Singh.

The prosecutor argued to the jury that McDaniel was the shooter who killed Singh. According to the prosecutor, the evidence suggested that McDaniel dropped the phone charger when he drew his firearm. In contrast, McDaniel's trial counsel argued to the jury that J.T. must have been the shooter. McDaniel's counsel asserted that McDaniel was taller than Singh, but J.T. was shorter than Singh. McDaniel's counsel told the jury that J.T.'s height matched the description of the fleeing male.

The jurors found true that both Ross and McDaniel were principals in this murder, and another principal discharged a firearm. The jurors did not find true that McDaniel personally discharged a firearm during this murder. The jurors also did not find true that McDaniel used a firearm when participating in a criminal street gang.

V. **The Cell Phone Evidence.**

An expert for the prosecution reviewed cell phone data. The expert explained that a cell phone will connect to a cell tower within an approximate 20- to 30-mile radius.

Hours before this murder, cell phone records suggest that McDaniel, Ross, J.T., and Hawthorne were in south Bakersfield. At the time of this homicide, their cell phones were all in the vicinity of Singh's apartment complex.

On the night in question, either Hawthorne or Ross used Ross's cell phone to communicate with Singh. This was done just before Hawthorne met Singh.

The first 911 call to report Singh's murder occurred at 11:25 p.m. Around the time of this homicide, neither Ross, McDaniel nor J.T. were using their respective cell phones.

The cell phone data shows that, within minutes after Singh's homicide was reported to authorities, the phones used by Hawthorne, Ross, McDaniel and J.T. had already traveled from the area near Singh's apartment complex back to south Bakersfield.

## DISCUSSION

### I. Hawthorne's Testimony was Sufficiently Corroborated.

With CALCRIM No. 334, the jurors were instructed that, before they could consider Hawthorne's testimony against the defendants regarding the charged crimes, they first had to decide whether she was an accomplice to those crimes. The term "accomplice" was defined for the jurors.[9] The jurors were told that, if they decided Hawthorne was an accomplice, they could not convict the defendants based solely on her statements. Instead, Hawthorne's statements needed corroboration through independent evidence that tended to connect a defendant to the commission of the crimes.

McDaniel argues that the trial court erred in giving this instruction. According to McDaniel, Hawthorne was an accomplice to murder as a matter of law. As such, McDaniel contends that the court should not have directed the jurors to make this factual determination, but, instead, the court should have instructed the jurors that they were

---

[9] "An accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)

10.

required to find evidence of corroboration.[10] McDaniel asserts that Hawthorne's testimony was not corroborated. According to McDaniel, absent Hawthorne's testimony, nothing connected him to Singh's murder. He maintains that his murder conviction should be reversed for insufficient evidence.

### A. *Standard of review.*

We use a de novo standard of review to analyze McDaniel's claim of instructional error. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206; *People v. Guiuan* (1998) 18 Cal.4th 558, 569–570.) A de novo standard is also used to analyze whether sufficient evidence corroborated an accomplice's testimony. (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 650.)

### B. *Analysis.*

The parties disagree whether Hawthorne was an accomplice as a matter of law. The parties also dispute whether the trial court erred in instructing the jurors to decide that foundational question. We need not resolve those issues. Instead, this record amply demonstrates that Hawthorne's testimony was corroborated. As such, even if instructional error occurred—a position we do not take—McDaniel did not suffer prejudice, so that claim fails. (See *People v. Lewis* (2001) 26 Cal.4th 334, 370 ["A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record"].)

To demonstrate a lack of corroboration, McDaniel relies primarily on (1) *People v. Robinson* (1964) 61 Cal.2d 373 (*Robinson*) and (2) *People v. Reingold* (1948) 87 Cal.App.2d 382 (*Reingold*).

---

**10**     See CALCRIM No. 335, which is given when it is undisputed that a witness is an accomplice. This directs a jury to look for corroborating evidence. The Bench Notes explain that CALCRIM No. 335 should be given if the trial court concludes a witness is an accomplice as a matter of law, or if the parties agree about the witness's status as an accomplice.

### 1. Robinson.

In *Robinson*, the defendant's fingerprints were found on a vehicle linked to a murder. (*Robinson, supra,* 61 Cal.2d at p. 397.) A codefendant testified that the defendant was involved in the murder. (*Id.* at pp. 397–398.) However, some evidence had suggested it was possible the defendant had placed his fingerprints on the vehicle for innocent reasons separate from the commission of this murder. (*Id.* at pp. 398–399.) According to the high court, the fingerprints were insufficient to corroborate the accomplice's testimony even though the fingerprints cast "grave suspicion" on the defendant. (*Id.* at p. 399.) The high court reiterated that, for corroboration evidence to be sufficient, it " 'must tend to connect a defendant with the crime itself,' " and not simply with the perpetrators. (*Id.* at p. 400.)

### 2. Reingold.

In *Reingold*, the California appellate court quoted from an 1880 Texas opinion for the proposition that corroborating evidence " 'must tend directly and immediately to connect the defendant with the commission of the offense.' " (*Reingold, supra,* 87 Cal.App.2d at p. 393, quoting *Simms v. State* (1880) 8 Tex.Ct.App. 230, 244.) The California appellate court explained that "corroboration, however strong in all other respects, must point to the connection of the defendant with the commission of the crime." (*Reingold, supra,* at p. 393.) The *Reingold* court stated that "corroboration is not sufficient if it *requires interpretation and direction* to be furnished by the accomplice's testimony to give it value." (*Ibid.*)

### 3. Sufficient Evidence Corroborates Hawthorne's Testimony.

McDaniel relies on the language from *Reingold*. He contends that, without Hawthorne's testimony, nothing "directly and immediately" connects him with Singh's murder. He also asserts that the remaining evidence against him needed Hawthorne's testimony for interpretation and value, rendering it insufficient.

In addition, McDaniel argues that, like the fingerprint evidence in *Robinson*, his DNA on the charger was insufficient to link him to Singh's murder. He notes it is unknown how and when he transferred his DNA to that charger. He states that the unknown female contributor on the charger might have been Hawthorne. McDaniel asserts that the cell phone records only placed his phone within a 30-mile radius of the crime scene. He asserts that the case against him rested "almost entirely" on Hawthorne's testimony. He contends that, without her testimony, he was not connected to this murder, and his murder conviction must be reversed.

We reject McDaniel's arguments. Even if the trial court erred in failing to instruct the jury that Hawthorne was an accomplice as a matter of law, any assumed error is harmless because her testimony was sufficiently corroborated.

To rely on an accomplice's testimony about the circumstances of an offense, a jury must find evidence that tends to connect the defendant with the crime without aid from the accomplice's testimony. (§ 1111; *People v. Garton* (2018) 4 Cal.5th 485, 518.) The trier of fact may take into consideration the entire conduct of the parties, including their relationship and actions. (*People v. Garton, supra,* at p. 518.) Corroborating evidence need not establish the identity of the victim's assailant. (*Ibid*.) It is also not required that such evidence will corroborate every fact to which the accomplice testifies. (*Ibid*.) Corroborating evidence may be circumstantial or slight, and entitled to little consideration on its own. (*Ibid*.)

When Hawthorne's testimony is set aside, the totality of the circumstantial evidence tends to connect McDaniel with Singh's murder. From the cell phone data, a reasonable inference may be drawn that Hawthorne, Ross, McDaniel and J.T. traveled together that fatal night. They were all together near Singh's apartment complex when this murder occurred. They all left that area just after this murder was reported.[11]

---

[11]     McDaniel notes that, around the time of Singh's murder, his phone connected to a tower in Palm Springs, over 200 miles away. However, this does not alter our analysis;

Two eyewitnesses reported that the fleeing suspect was wearing a white shirt or sweatshirt. Video from social media showed Ross wearing a black shirt earlier that same day. Video from social media showed J.T. wearing a black shirt on the night of the homicide. Video from social media showed McDaniel wearing a white shirt the day before this homicide.

McDaniel was arrested the day after Singh was killed. McDaniel and J.T. were back passengers in a vehicle from which the fatal firearm was recovered. That firearm was located under the backseat where J.T. was sitting.

Finally, it is unknown how or when McDaniel's DNA was transferred to the charger found near Singh's body. Nonetheless, McDaniel's DNA links him to Singh's murder, especially when coupled with the cell phone data and the other circumstantial evidence. Even though all of the circumstantial evidence is relatively slight and entitled to little consideration on its own, the totality of this record is sufficient to corroborate Hawthorne's testimony. Accordingly, *Robinson* is distinguishable.

Likewise, *Reingold* does not establish error. The *Reingold* court explained that corroborating evidence, no matter how strong in other respects, "must point to the connection of the defendant with the commission of the crime." (*Reingold, supra,* 87 Cal.App.2d at p. 393.) That standard was met here. Even without Hawthorne's testimony, the remaining evidence has some value. The totality of the circumstantial evidence demonstrates McDaniel's connection with the commission of Singh's murder. In other words, McDaniel is " 'directly and immediately' " connected with this offense. (*Ibid.*)

McDaniel cites cases from other jurisdictions for the proposition that trace DNA at a crime scene does not directly connect a person to the commission of that crime. Those

the prosecution established that this was a clerical mistake made by the cell phone company. The remaining phone records showed that McDaniel's phone was in the area of Singh's apartment complex around the time of this murder.

14.

opinions from other jurisdictions are not binding on this court. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 490 [out-of-state opinions are not binding on California courts.]; *People v. Avena* (1996) 13 Cal.4th 394, 431 [California courts are not bound by decisions of the lower federal courts, even on questions of federal law.].) In any event, we need not further address those authorities because this record contains more than McDaniel's DNA to corroborate Hawthorne's testimony. The totality of the circumstantial evidence tends to connect McDaniel with Singh's murder.

Finally, McDaniel points to the prosecutor's closing arguments. The prosecutor admitted to the jurors that the cell phone evidence and McDaniel's DNA did not necessarily establish that McDaniel was at the scene of the murder.

McDaniel argues that the prosecutor made the DNA evidence relevant only when considered in light of Hawthorne's testimony. According to McDaniel, the prosecutor failed to satisfy the requirements of section 1111. We disagree.

The prosecutor made it clear to the jury that the DNA evidence and the cell phone data corroborated Hawthorne's testimony. Indeed, the prosecutor argued to the jury that the cell phone evidence suggested the defendants were "together" that night, and they traveled to the apartment complex. The prosecutor argued that the DNA evidence on the charger made it possible to believe Hawthorne's testimony.

The requirements of section 1111 were met. Setting aside Hawthorne's testimony, the circumstantial evidence tends to connect McDaniel to the commission of Singh's murder. (§ 1111.) Therefore, even if she was an accomplice as a matter of law, Hawthorne's testimony was sufficiently corroborated. Accordingly, McDaniel's claim lacks merit, and we will not reverse his murder conviction.

## II. The Gang Enhancement and the Firearm Enhancement in Count 1 Must Be Reversed.

The jury in this matter learned that the West Side Crips are a criminal street gang that operates in certain areas of Bakersfield, California. This gang's primary activities

include murder, among other crimes. The prosecution established that Ross, McDaniel and J.T. were all active gang members in the West Side Crips when Singh's murder occurred.

Based on a hypothetical matching the evidence surrounding Singh's murder, the prosecution's gang expert opined to the jury that this killing was done for the benefit of, in furtherance of, and in association with the West Side Crips.

In count 1, the jury found McDaniel guilty of second degree murder. The jury, however, found not true that McDaniel personally discharged a firearm that caused death.

In count 1, the jury found true that McDaniel committed murder for the benefit of, at the direction of, or in association with the West Side Crips (§ 186.22, subd. (b)(1)). The jury also found true that McDaniel was a principal in the murder, and at least one principal intentionally and personally discharged a firearm during the commission of this crime (§ 12022.53, subds. (d), (e)(1)).

McDaniel was sentenced to prison for 15 years to life for Singh's murder. Because of the true finding on the firearm enhancement, his sentence was enhanced by 25 years to life.

On appeal, the parties agree, as do we, that insufficient evidence supports the gang enhancement. The firearm enhancement was dependent on the gang enhancement. (See § 12022.53, subd. (e)(1).) As a result, we further agree with the parties that both the gang enhancement and the firearm enhancement must be reversed.

Reversal of the gang enhancement is required because, in committing this murder, McDaniel must have provided a "common benefit" to members of his gang that is "more than reputational." (§ 186.22, subd. (g); see also *People v. Renteria* (2022) 13 Cal.5th 951, 967 [committing a violent crime to enhance the gang's reputation for viciousness does not support an inference that a defendant committed a particular violent crime for the benefit of the gang].) "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a

16.

perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

This law requiring more than a reputational benefit became effective January 1, 2022. (Stats. 2021, ch. 699, § 3.) This law was already in effect when the first witness testified in this matter in October 2022.

Singh was not a rival gang member. Indeed, there was no evidence he was a member of any gang. At trial, the prosecution's gang expert opined that Singh's murder could elevate the reputation of the West Side Crips. According to the gang expert, the gang would benefit because it put the community on notice that it was "willing to kill even people [who] are not actual gang members."

The prosecution's gang expert admitted that the hypothetical mirroring of Singh's murder did not involve any "gang indicia." The hypothetical had no gang signs, gang colors or gang expressions.

We agree with the parties that the prosecution failed to prove that Singh's murder provided a common benefit to members of the West Side Crips that was more than reputational. (§ 186.22, subd. (g).) As such, insufficient evidence supports the gang enhancement in count 1. Consequently, we will vacate the jury's true finding, and we will reverse that enhancement (§ 186.22, subd. (b)(1)).[12]

The firearm enhancement which the jury found true was contingent on the gang enhancement. (§ 12022.53, subd. (e)(1); *People v. Cooper* (2023) 14 Cal.5th 735, 746.) Thus, we also agree with the parties that this firearm enhancement must be reversed for insufficient evidence. We will vacate McDaniel's sentence and remand this matter for resentencing. Based on the principle of double jeopardy, retrial is barred. (See *Lockhart*

---

[12]     At trial, McDaniel's counsel conceded to the jury that McDaniel was guilty of active gang participation as charged in count 6. On appeal, McDaniel does not challenge the validity of that conviction.

*v. Nelson* (1988) 488 U.S. 33, 39; *People v. Garcia* (2014) 224 Cal.App.4th 519, 526 [a gang enhancement reversed for insufficient evidence may not be retried].)

## DISPOSITION

The true finding in count 1 regarding the gang enhancement (§ 186.22, subd. (b)(1)) is reversed. The true finding in count 1 regarding the firearm enhancement (§ 12022.53, subds. (d), (e)(1)) is reversed. Retrial is barred for these enhancements. McDaniel's sentence is vacated, and this matter is remanded for resentencing. In all other respects, the judgment is affirmed.


LEVY, Acting P. J.

WE CONCUR:


SNAUFFER, J.


FAIN, J.*

---

\*      Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.